## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| APRIL RUMBAUGH, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> USANA HEALTH SCIENCES, INC., DAVID A. WENTZ, and PAUL A. JONES, et al. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Case No. 2:17-cv-00106-DB**

Honorable Dee Benson

**CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiff Chi Wah On ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his consolidated amended complaint against Defendants, alleges the following based upon personal knowledge as to himself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding USANA Health Sciences. Inc., ("USANA" or the "Company"), analysts' reports and advisories about the Company, statements of former USANA employees, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired USANA securities between March 14, 2014 and February 7, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     USANA develops, manufactures, and sells science-based nutritional and personal care products primarily to reduce the risk of chronic degenerative disease.  The Company was founded in 1992 and is headquartered in Salt Lake City, Utah. USANA's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "USNA."

3.      USANA is also a multi-level marketing ("MLM") company that relies on its existing distributors to recruit new distributors by paying the existing distributors a percentage of their recruits' sales; the recruits are known as a distributor's "downline"; while the distributor is known as the recruits' "upline." All distributors also make money through direct sales of products to customers.

4.      China has an absolute prohibition on MLM, *i.e.,* on payment to promoters based on the recruitment of other promoters, rather than based on sales to customers.

5.      Accordingly, MLM companies like USANA must modify their business models to focus on direct sales to consumers, as opposed to distributor recruitment.

6.      At first, in order to circumvent Chinese laws banning MLM, USANA recruited Chinese nationals into USANA and had them register using a fictitious address in Hong Kong. In the course of doing so, USANA facilitated the willful falsification of records in violation of the Foreign Corrupt Practices Act ("FCPA").

7.      USANA's Hong Kong-based revenue subsequently exploded between the years 2009 and 2012, while the Company continued its scheme of illicit sales in China.

8.      On August 16, 2010, USANA announced that it had acquired BabyCare Ltd. ("BabyCare"), a People's Republic of China ("China")-based manufacturing company that develops and sells nutritional products primarily for infants.

9.      BabyCare's direct selling license allowed it to act as a vehicle for USANA to establish a behind-the-scenes presence in China.

10.     In February 2013, the Company announced that it had received official government approval from the Ministry of Commerce People's Republic of China

("MOFCOM") for direct selling activities in the provinces of Jiangsu and Shaanxi, and the municipality of Tianjin.

11.    Almost immediately thereafter, the Company received an official warning regarding its compliance with Chinese laws on MLM, which was never reported to investors.

12.    At the same time, Hong Kong sales began to decline in direct proportion to the rise in mainland China sales, as sales once attributed to USANA's Hong Kong market appeared to be reported in Babycare.  This falsification of Company financials constituted a second, independent violation of the FCPA.

13.    In May 2016, USANA announced MOFCOM approval for direct selling activities in the provinces of Liaoning, Shandong, Shanxi, Sichuan, and Guangdong, as well as the municipalities of Dalian, Qingdao, and Shenzhen.

14.    Despite being in possession of a hard-to-obtain direct selling license, the Company, which claims to monitor its distributors' activities closely, continued to engage in banned MLM practices, a fact that was also never disclosed to USANA shareholders, and likely fueled its explosive China sales.

15.    Between 2010 and 2016, USANA's "Greater China" sales increased by more than 200%, which included redirected Hong Kong sales and/or illegal "pyramid scheme" practices.

16.    Local police opened an investigation into BabyCare/USANA in September 2016 after receiving complaints of illegal MLM conduct.

17.    By October 2016, the initial inquiry had morphed into a full-blown national investigation.

18.    In November 2016, USANA again received a warning from authorities concerning its compliance with Chinese law.

19.     Neither the local and national investigations nor the warning from authorities were ever communicated to USANA investors.

20.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) a nation-wide investigation in China into illegal multi-level marketing practices by BabyCare and/or USANA had kicked off in October 2016; (ix) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (x) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

21.     Instead of making full disclosure as is required under the federal securities laws, the Company took pains to reassure investors that its China operations were booming on the basis of direct sales only, that all growth was "organic," that nonemployee affiliates were being

trained and closely monitored, and that BabyCare/USANA was working closely with local regulators.

22.     On February 7, 2017, after the market had closed, USANA disclosed that "[t]he Company is voluntarily conducting an internal investigation of its China operations, BabyCare Ltd. . . . focus[ing] on the compliance with the Foreign Corrupt Practices Act . . . and certain conduct and policies at BabyCare, including BabyCare's expense reimbursement policies." USANA advised investors that the company had retained outside counsel to conduct the investigation and had notified both the SEC and the U.S. Department of Justice ("Justice Department") of the investigation.

23.     On this news, USANA's share price fell $7.25, or 11.57%, to close at $55.40 on February 8, 2017.

24.     On or about March 3, 2017, Chinese authorities carried out a series of arrests of BabyCare personnel on charges of pyramid selling.  In addition, BabyCare accounts totaling more than 300 million renminbi (RMB) were frozen by authorities.

25.     Eventually, the arrests and frozen assets were disclosed to investors via a report published on a popular investor website.

26.     While the Company initially sought to deny the revelations, it ultimately admitted their substantial truth.

27.     USANA has since acknowledged that the cost imposed by FCPA inquiry alone is affecting the Company's bottom line.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

29.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is properly laid in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  USANA is headquartered within this District.

32.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

33.     Plaintiff, as set forth in the Certification attached to his motion for appointment as Lead Plaintiff in this matter, acquired USANA securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

34.     Defendant USANA is incorporated in Utah, with its executive offices located at 3838 West Parkway Boulevard, Salt Lake City, Utah 84120.  USANA's shares trade on the NYSE under the ticker symbol "USNA."

35.     Defendant David A. Wentz ("Wentz) served as the Company's Co-Chief Executive Officer from August 4, 2015 to November 23, 2016, when he abruptly resigned his position.  Wentz served as the Chief Executive Officer of USANA Health Sciences Inc. since July 2008.  During the Class Period, Wentz sold more than 94,000 shares of USANA.

36.     Defendant Kevin G. Guest ("Guest") served as the Company's Co-Chief Executive Officer of from August 4, 2015 to November 23, 2016, having previously served as its President since August 1, 2014 until August 2015.  Since November 23, 2016, Guest has served as the Company's sole Chief Executive Officer.

37.     Defendant Paul A. Jones ("Jones") has served at all relevant times as the Company's Chief Financial Officer and Chief Leadership Development Officer.

38.     Defendant G. Douglas Hekking ("Hekking") has been the Company's Chief Financial Officer since May 2, 2017 and served as its Executive Vice President of Finance and Accounting from January 9, 2017 to May 2, 2017. Mr. Hekking served as Vice President of Financial Strategy at USANA from December 14, 2012 to January 9, 2017 and served as its Chief Financial Officer from May 10, 2011 to December 14, 2012.

39.     The Defendants referenced above in ¶¶ 35 -38 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

**Company Background**

40.     Founded in 1992 by Myron Wentz, USANA, which is based in Salt Lake City, Utah, develops, manufactures, and sells science-based nutritional and personal care products primarily (and allegedly) to reduce the risk of chronic degenerative disease.  The Company offers its products directly in the Asia Pacific, the Americas, and Europe.  USANA is also an MLM company that makes most of its revenue from the product purchased by its sales representatives, also known as distributors or associates.

41.     USANA produces three product lines: Usana Nutritionals (Essentials, Optimizers, and Digestion/Detox nutritional supplements), Usana Diet & Energy (Reset meal replacement shakes, protein bars, and Rev3 energy drinks), and Sensé personal care (skin care, skin treatment, and hair & body care products).

42.     USANA manufactures 90% of its products in-house, including all of its tableted nutritional supplements.

43.     USANA has justified the often high costs of its products with claims that they offer "high-quality, certified nutritional supplements that are in a class by themselves." However, Anthony Almada, the president and chief scientist of Imaginutrition, a consulting firm for the nutritional supplement industry, has stated that "[t]he economic reality of Usana, and other [multilevel marketing] entities, mandates that their products invariably lack robust distinctiveness and convincing evidence of consumer relevance and superiority achievable through rigorous clinical trials only to their retail counterparts".

44.     USANA sells its products through MLM channels: distributors recruit and profit from other distributors. The products are not available through retail channels, but instead can only be obtained through one of its distributors or by direct order through the Company.

45.     USANA promotes its image and products aggressively, as evidenced by a 40-minute YouTube video, entitled "Invisible Miracles," in which USANA's work is compared to the moon landing.  Myron Wentz is introduced standing atop a mountain and is portrayed as a peer of Linus Pauling, Mother Teresa, Albert Einstein and Thomas Edison.[1]

---

[1] https://www.youtube.com/watch?v=9wVJLdJEeLw

46.     Like other MLM companies such as Amway and Herbalife, USANA's sales force are primarily *not* full time employees, and they earn compensation and rewards by recruiting others to buy and sell the Company's products.

47.     In 1996, USANA went public.  Around the same time, Myron Wentz renounced his U.S. citizenship for a tax haven, St. Kitts and Nevis.

48.     In 2007, several USANA executives were discovered to have made false statements regarding their qualifications.  These  included Denis Waitley, a member of the board of directors who had falsely claimed to hold a master's degree from the Naval Postgraduate School; sales associate Ladd McNamara, who quit the Company's medical advisory board after it was discovered that his license to practice medicine had been revoked; Vice President of Research and Development, Timothy Wood, who was found to have a doctorate in forestry, as opposed to biology as he had claimed; and Executive Vice President and Chief Financial Officer Gilbert Fuller, who had continued to use the title of CPA (or Certified Public Accountant) even though his CPA license had expired 10 years before he joined USANA in 1996.

49.     In 2007, short-seller Barry Minkow ("Minkow") sent the SEC a 500-page-long report, accusing USANA of being a "pyramid scheme." Robert Fitzpatrick, the president of Pyramid Scheme Alert, who was contracted by Minkow to review USANA's structure, stated that "[t]he company's sales model is untenable, at least from the point of view of recent recruits being able to find new distributors to work for them. "If this chain were continued just 26 levels, it would exceed the number of households in the U.S.A.," Fitzpatrick said in a report at the time, "Usana's 'success' depends on the 'failures' of tens of thousands of recruits."[2]

---

[2] "Hard to Swallow," *Forbes* (Aug. 8, 2007):  https://www.forbes.com/2007/08/08/usana-vitamins-marketing-markets-equities-cx_er_0808usana.html

50.     Minkow's claims resulted in an informal SEC investigation, as well as the resignation of USANA's longtime auditor, Grant Thornton, due to disagreements with the Company over procedures for an outside, independent investigation of the charges.

51.     On the day Minkow's report was released, USANA's shares had traded at $61.19 but by August 2008 the share price had tumbled to less than $35.

52.     In August 2007, USANA announced that it had been notified by the SEC that its shares were subject to delisting from the NASDAQ because the company had failed to have the financial information in its quarterly Form 10-Q reviewed by an independent auditor.  USANA reported this was due to their public accountant resigning and not having been replaced.

53.     In response, USANA sued Minkow for defamation and stock manipulation, even though Minkow had revealed in his report that he was betting on USANA's stock to go down.

54.     USANA dropped the defamation suit in March 2008, after Judge Tena Campbell of the United States District Court for the District of Utah threw out four of the five claims brought by USANA against Minkow, ruling that USANA's claims violated California's anti-SLAPP law for suing Minkow for fair criticism, and that USANA did not show a reasonable probability of winning on those claims.  The court also cited two examples where USANA failed to refute Minkow's claims that their products were overpriced and of no better quality than other, lower-priced brands.  The remaining charge of stock manipulation was settled in July 2008 when USANA and Minkow reached an undisclosed settlement.  Separately from the settlement, the Company paid nearly $150,000 in attorney fees to Minkow and his Fraud Discovery Institute pursuant to a court order.

55.     Around the same time, Myron Wentz tried to take the Company private at a share price of $26, when shares ranged from $18 to over $50. At the time, he reportedly stated the

11

motive was to reduce transparency.  In an article entitled, "Usana Chief Wants Privacy," *Forbes* wrote at the time, "In taking Usana private, the company's head remarked on the benefits of operating 'without the pressures and distractions brought on by the public market.'"

56.   In July 2008, Myron Wentz stepped down as CEO of the Company in favor of his son, Defendant Wentz.

57.   The elder Wentz still retains a 51% stake in the Company, and sold more than 300,000 shares during the Class Period.

58.   On January 3, 2011, USANA completed the transfer of its common stock from the NASDAQ to the NYSE.

**U.S. Regulation of MLM Companies**

59.   MLM, also called "pyramid selling," "network marketing," and "referral marketing," is a controversial marketing strategy for the sale of products and/or services where the revenue of the MLM company is derived from a non-salaried workforce (also called participants, and variously known as "salespeople", "distributors", "consultants", "promoters", "independent business owners", etc.) selling the company's products/services, while the earnings of the participants is derived from a pyramid-shaped commission system:



60.   Independent distributors develop their organizations by either building an active consumer network, who buy direct from the company, or by recruiting a downline of

independent distributors who also build a consumer network base, thereby expanding the overall organization.

61.     The combined number of recruits from these cycles are the sales force which is referred to as the salesperson's "downline." This "downline" is the pyramid in MLM's multiple level structure of compensation.

62.     Assuming the blue individual in the above graphic recruits five, and those five recruit their own five, and so on, the maximum theoretical cycles of recruits possible in the "downline" of the blue individual is 14 cycles ($5^{14}$ = 6.1 billion people), after which point the total human population is exceeded.

63.     Which ostensibly legal, MLM practices have long been controversial and have come under heavy scrutiny in the United States.

64.     The U.S. Federal Trade Commission (FTC) states: "Why is pyramiding dangerous? Because plans that pay commissions for recruiting new distributors inevitably collapse when no new distributors can be recruited. And when a plan collapses, most people—except perhaps those at the very top of the pyramid—end up empty-handed."

65.     In the U.S. MLM practices in the U.S. must satisfy a set of guidelines (the "Amway Rules") aimed at protecting distributors to avoid classification as an illegal pyramid scheme.

**Chinese Regulation of MLM Companies**

66.     At the end of 2005, China passed a law entitled the "Regulation of Direct Sales and Regulation on Prohibition of Chuanxiao."

67.     "Chuanxiao" (传销) translates to "multi-level marketing" or "pyramid selling."

13

68.     The 2005 law codified the rules in China with respect to MLM.  The crux of the law is that direct sales in China are legal and MLM in China is illegal. The law also required a business license for a company to participate in direct sales.

69.     The 2005 law goes on to discuss the prohibitions on Chuanxiao, defining multi-level payouts as illegal pyramid schemes – a designation that is stricter than in the U.S. and other countries where MLM companies are permitted to operate pursuant to applicable laws and regulations.

70.     The term "pyramid selling" as defined in the Regulation, refers to any actions by which an organizer or operator:

Recruits members, and calculates remuneration of and pays those members based on the number of sales made by the people that the members directly or indirectly recruit; or

Requires members to pay an entry fee for participation, which results in their obtaining unlawful interests, disturbs economic order, and affects social stability.

71.     Article 7 of China's 2005 law uses the terms "multi-level cheating" and "illegal pyramid scheme" interchangeably when discussing any structure that pays out on a multi-level basis.  The law does not provide for any loopholes, simply stating that any commission payouts of more than one level may be met with legal action, including but not limited to arrest or forfeiture of assets.

72.     In neighboring Taiwan (which is not under Chinese control) and Hong Kong (which is, but is subject to a different regulatory scheme than mainland China), multi-level marketing is legal, which lends itself to the practice of sales representatives from these jurisdictions coming in and doing sales in China, or, alternately, Chinese nationals using Taiwanese or Hong Kong addresses and banking to become sales reps in these jurisdictions while at all times living and working in mainland China.

73.     Indeed, field research in China conducted by short sellers and independent media concerning Herbalife, Amway, and USANA have shown that the same USA-style recruiting and payment structures are being made by MLM companies in China, despite the 2005 law.

74.     As one blogger put it, "Chinese authorities … could swiftly close down or fatally harm any major MLM operating there by merely enforcing existing law. No 'complex economical analysis' or parsing of the meaning of 'pyramid scheme' is required in China. Investigations and prosecution can equate to a public execution."[3]

75.     In 2012, short seller Andrew Left's Citron Research accurately claimed that Nu Skin Enterprise, Inc.'s – another Utah-based MLM company – direct-selling business in China was actually "pyramid-selling" and was illegal under Chinese law.

76.     Left accused USANA of the same practices in 2013, and USANA shares declined by twelve percent in early 2014 after the Chinese government opened an investigation into Nu Skin.[4]

77.     Ultimately, Nu Skin –

….. was found to have sold products that were not registered for direct sale, which resulted in a fine of RMB 150,000 and confiscation of all the illegal sales revenue of RMB 3,114,000 by the Shanghai AIC. Nu Skin China was also found to have overstated the effectiveness of its products and, as a result, was fined RMB 100,000 by the Shanghai AIC. Additionally, the officials at the Beijing AIC imposed a fine of RMB 130,000 on each of the six sales representatives of Nu Skin China for their unauthorized promotional direct sales activities and confiscated illegal gains of RMB 1,368,000. The Beijing AIC also ordered Nu Skin to enhance the education and supervision of its sales staff and to shut down all its "working studios", which are the small offices that were accused of engaging in illegal activities. SAIC also announced in the same statement that, as a next step, it will work with other authorities to enhance the level of regulation of

---

[3] Robert Fitzpatrick, "The Real USANA Revealed," *Seeking Alpha* (Aug. 1, 2017), https://seekingalpha.com/article/4093044-real-usana-revealed

[4] "China's Nu Skin probe drags down Herbalife, USANA too." Reuters.com (Jan. 16, 2014), http://www.reuters.com/article/us-shire-results-idUSKBN1AJ1KI

the direct sales market, and harshly crack down on and prosecute any illegal activities.[5]

78.     Nu Skin shares lost a third of their value in the wake of these revelations, despite the fact that, like USANA, Nu Skin possessed the required license to engage in direct sales activities in China.

79.     In the wake of the Nu Skin debacle, the director of the Chinese anti-MLM Association told a *Beijing Youth News* reporter:

> It's not just Nu Skin, today the so called direct selling industry is a mess.  Even if they get the direct selling license from the Ministry of Commerce, their business model is still done via assembling a team and developing downlines. They may hold up the flag of direct selling but in essence, they are conducting MLM.

80.     For investor purposes, MLM companies entering new markets like China are particularly vulnerable to the "pop-and-drop" phenomenon, characterized by an explosive burst of revenue – which tends to have the effect of luring investors – followed by a sudden and precipitous drop-off.  As one commenter explained:

> So, with Amway as the model, USANA's pathway is in plain sight. Amway's amazing revenue growth over the last 10 years has been based almost totally on explosive *expansion* in China; and its precipitous three-year drop in global revenue of 25% is also accounted for by the inevitable *declines* in China. To speak of USANA's future, therefore, does not require a Ph.D. or complex analysis. China, following Amway, has been USANA's "pop" and without it, the company would already have been known for its predictable "drop."

> The pop-and-drop phenomenon, universal among "multi-level marketing" companies and pyramid schemes in general, portends USANA's most recent and future performance. Pop-and-drop is inherent and predestined. Consider. Why do hundreds of thousands of new USANA "salespeople" - who are said to be so loyal and excited about the brand they not only want to buy the goods but also pay additional fees and sign contracts to become eligible to sell them - disappear each year? Shouldn't, by now, USANA have established brand awareness on Main Street? Shouldn't its testimonials and endorsements by celebrities already have created a stable customer base that would enable its salespeople to easily take

---

[5] Davis Wright Tremaine LLP, "Nu Skin fined in China for improper direct sales activities." (Apr. 28, 2014):  http://www.lexology.com/library/detail.aspx?g=8ec31e78-5e09-4c3b-afa6-c647dca04e81

repeat orders? Shouldn't, after all these years, USANA have an enormous and growing body of regular users in the USA, where it started? Even if millions of the salespeople abandoned the "income opportunity" and are no longer under contract, wouldn't they at least still be users?

Yet, as USANA's data show, from 2010 to 2016, "USA" revenue declined 14%. USA is placed in quotes because, just as declines started being noted, USANA changed its definition of "USA" to include the UK and The Netherlands! It now refers to the USA and Europe as a single market, and it does not disclose actual revenue only from the USA, as all other companies do normally in SEC filings. So, actual USA revenue may have decreased much more.[6]

## The Foreign Corrupt Practices Act

81.    The FCPA was enacted in 1977 in response to revelations of widespread bribery of foreign officials by U.S. companies in order to win business.

82.    The FCPA contains two main components: the anti-bribery provisions, which prohibit payments to foreign officials to obtain or retain business, and the accounting provisions that require issuers to make and keep accurate books and records and to maintain an adequate system of internal accounting controls. The accounting provisions also prohibit individuals and businesses from knowingly falsifying books and records or knowingly failing to implement internal controls.

83.    Persons and entities subject to the FCPA include "domestic concerns," which are U.S. persons and businesses. "Issuers," which are U.S. and foreign public companies listed on U.S. stock exchanges or which are required to file periodic reports with the SEC, also are subject to the FCPA.  In addition, certain foreign persons and businesses acting while in the territory of the United States may be subject to the FCPA.

84.    The FCPA's accounting provisions contain two main components:

---

[6] Fitzpatrick, "The Real USANA Revealed," https://seekingalpha.com/article/4093044-real-usana-revealed

85.     First, the books and records provisions require issuers to make and keep records that accurately and fairly reflect an issuer's transactions and dispositions of assets.

86.     Second, the FCPA contains provisions regulating internal controls, which require that issuers devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets.

87.     There can be civil liability under the accounting provisions for both companies and individuals. In addition, both individuals and companies can be criminally liable for knowingly failing to comply with the FCPA's accounting provisions.

88.     Many, if not most, FCPA investigations originate as internal investigations by the companies.  After an internal investigation is completed, a company may determine that it should "self-report" to the SEC or Department of Justice at which point the SEC or Justice Department may commence its own investigation. A company conducting an internal investigation should consider when it is appropriate or necessary to give notice to its insurer of a claim or potential claim. Different policies contain different notice requirements, so it is important for insureds and insurers to be familiar with the notice language and requirements of their policies and to proceed accordingly.

89.     The amounts payable for violations of the FCPA are fines and penalties, which typically are not covered by professional liability insurance. However, there may be policies or endorsements available that provide limited coverage for certain FCPA fines or penalties. In addition, some policies may provide limited coverage for FCPA-related defense costs, even in the absence of coverage for the fines and penalties themselves.

**USANA's Expansion Into China**

90.     Prior to acquisition of BabyCare, USANA was allowed to conduct MLM business in Hong Kong, which has a population of about 7 million.

91.     Starting in 2009, USANA's revenue for Hong Kong began increasing at a rapid pace, peaking at $48.5 million in the fourth quarter of 2012:



USANA's Reported Hong Kong Market Sales Reported In SEC Filings

■ USANA Reported Hong Kong Sales

92.     During the 2007 to 2010 period, USANA gained 39,000 active associates, which is a 300% increase, meaning that Hong Kong had one USANA associate for every 135 citizens, compared to 1 in every 5,436 people in the U.S. during the same period.

| Territory | 06/30/07 | 07/03/10 | USANA Associates Per Citizen |
|---|---|---|---|
| **North American Region** | | | |
| United States | 63,000 | 57,000 | 1 : 5,436 |
| Canada | 27,000 | 26,000 | 1 : 1,315 |
| Mexico | 14,000 | 12,000 | 1 : 9,268 |
| **SE Asia/Pacific Region** | | | |
| Australia-New Zealand | 21,000 | 18,000 | 1 : 1,476 |
| Singapore | 8,000 | 5,000 | 1 : 998 |
| Malaysia | 11,000 | 14,000 | 1 : 2,022 |
| Philippines | 0 | 7,000 | 1 : 13,140 |
| **E Asia Region** | | | |
| **Hong Kong** | **13,000** | **52,000** | **1 : 135** |
| Taiwan | 15,000 | 11,000 | 1 : 2,095 |
| **N Asia Region** | | | |
| Japan | 4,000 | 4,000 | 1 : 35,855 |
| South Korea | 2,000 | 4,000 | 1 : 12,190 |

93.     USANA's seemingly inexplicable Hong Kong is most likely attributable to an attempt to circumvent China's 2005 law banning MLM.   USANA recruited Chinese nationals into USANA, then had them register using a fake address in Hong Kong (*e.g.,* "Room 1906 Kwong Yat House").   In this way, Chinese nationals appeared to be residing in Hong Kong when, in fact, they resided in mainland China.

94.     A review of a genealogy report from an upper-level USANA distributor who had thousands of Chinese nationals in their downline reveals thousands of these distributors sharing the same Hong Kong address.[7]

95.     In 2010, USANA finally obtained the direct selling license it needed – one of just twenty-five Beijing licenses -- by purchasing BabyCare, which held one of those coveted direct selling license.   While MLM is illegal in China, but there's no such ban on direct selling, where distributors sell their product direct to customers.

[7] USANA May Have Made Half a Billion Dollars In Sales From Conducting Illegal Multi-Level Marketing In Mainland China," http://usanawatchdog.blogspot.com/2014/10/usana-may-have-made-half-billion.html (Oct. 20, 2014).

96.     Specifically, BabyCare possesses a direct selling license in mainland China through Single-Level Marketing, which means there are no downlines or commissions paid to any upline members.

97.     Over the next six years, USANA steadily expanded BabyCare's market presence in China.

98.     Revenue and recruits doubled between 2010, when USANA acquired BabyCare, and 2016, when total annual revenue topped a billion, and nearly a half-million people signed up for USANA's MLM "business opportunity." In all, millions of people are or have been "salespeople" for USANA as it exploded in revenue. All told, from 2010 to 2016, USANA's "Greater China" revenue grew 227% and accounted for 72% of all USANA revenue increase:

| Usana Revenue Data Global and "USA" and Greater China Regions 2010-2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2010-2016 |
| Total Revenue in millions | $517.60 | $582.00 | $648.70 | $718.20 | $790.50 | $918.50 | $1,000.01 | |
| Annual Revenue Increase in millions | | $64.40 | $66.70 | $69.50 | $72.30 | $128.00 | $81.51 | $482.41 |
| Active Associates | 228,000 | 222,000 | 247,000 | 265,000 | 349,000 | 421,000 | 471,000 | |
| USA Revenue as % of Total | 29.10% | 25.40% | 23.50% | 21.90% | 18.20% | 15.20% | 13% | |
| Total USA Revenue in millions | $150.62 | $147.83 | $152.44 | $157.29 | $143.87 | $139.61 | $130.00 | -$20.62 |
| Greater China Revenue as % of Total | 29.40% | 35.20% | 36.30% | 37.90% | 41.30% | 48% | 49.90% | |
| Greater China Revenue in millions | $152.70 | $204.86 | $235.48 | $272.20 | $326.48 | $440.88 | $499.00 | |
| Greater China Annua Revenue Increase | | $52.16 | $30.61 | $36.72 | $54.28 | $114.40 | $58.12 | $346.30 |
| Greater China Revenue Increase as % of Total Annual Revenue Increase | | 81.00% | 45.90% | 52.83% | 75.07% | 89.38% | 71.31% | 71.79% |

99.     In February 2013, the Company announced that it had received official government approval from MOFCOM for direct selling activities in the provinces of Jiangsu and Shaanxi, and the municipality of Tianjin.

100.     By the First Quarter of 2013, BabyCare sales began to increase rapidly. With respect to USANA, this would appear to reflect the transfer of reported sales from one market to another. Reported sales in Hong Kong during this period decreased by almost the precise amount that sales for BabyCare China increased:



101.    According to an article published on March 21, 2017, on the website of *Shandong News* (鲁网), "in 2013 BabyCare already received a warning from Chengdu Administration for Industry and Commerce over failure in complying with regulations in its direct sales practice."[8]

102.    In May 2016, USANA announced MOFCOM approval for direct selling activities in the provinces of Liaoning, Shandong, Shanxi, Sichuan, and Guangdong, as well as the municipalities of Dalian, Qingdao, and Shenzhen.

103.    Chinese media has reported that in September 2016 –

Hengyang (Hunan) Police received tip-offs from local victims, accusing BabyCare of pyramid sales. BabyCare Hengyang employed a reward scheme that not only rewards the sales people over sales performance, but also rewards them

---

[8] "On the police investigation of BabyCare: the importance of public relations management for direct sales enterprises" (Chinese original title: 从葆婴涉传销被查谈起：直销企业 "外事无小事"),  http://f.sdnews.com.cn/zx/hyxw/201703/t20170321_2217058.htm  [English translation by consultants engaged by undersigned counsel].

for developing new sales personnel. The policy is internally known as double channel reward policy. Such practice is suspected to be pyramid sales.[9]

104.     According to the same source:

The police and the local Administration for Industry and Commerce identified BabyCare's policy as pyramid scheme following joint preliminary investigation. Subsequently, a nation-wide investigation was kicked off in October 2016.  The law-enforcement officers carried out investigation guided by BabyCare's personnel network across mainland China, from Guangzhou to Beijing.   In-depth investigation was carried out in Hengyang, Yiyang, Changsha, Guangzhou, and Beijing. **The law enforcement officers collected sufficient evidence to support the suspicion of pyramid scheme and carried out law-enforcement.**

(Bold added).

105.     As reported by the *Shandong News*, "the police investigation on BabyCare started in September 2016. A warning was issued to BabyCare in November. The related personnel at BabyCare did not take the warning seriously and the situation continued to escalate."

106.     The same article states that, "[o]n March 3, 2017, the police arrested an employee of the investigated enterprise from its Guangzhou office, as well as over 10 senior level [non-employee] distributors. One of the distributors was later released on bail."  All told, "[t]he police arrested 3 employees from BabyCare Guangdong subsidiary and released one of them on bail afterwards because she was pregnant."

107.     According to the *Shandong News*, "BabyCare's company account continued to receive payments following the initial freezing of RMB 360 million, and the incoming payments were also frozen. By the time of this report, the frozen amount reached RMB 386 million."

108.     The article reported that even before the events of March 3, 2017, BabyCare had "already received certain penalties on its Shanxi, Shanghai, and Guangdong subsidiaries …. In

---

[9] "Explosive revelation | BabyCare on suspicion of pyramid sales, 13 arrested and another 10 wanted" (Chinese original title: 江湖爆料 | 葆婴涉传，已刑拘13人，挂网通缉数十人), http://www.dspinglun.com/content/?3704.html [English translation by consultants engaged by undersigned counsel].

this fashion, BabyCare received numerous warnings and penalties. Following these embarrassing disasters, BabyCare still failed to carry out any form of improvement over its public relations and compliance management."

**Confidential Witnesses**

109.    Confidential Witness ("CW") 1 worked as an international distributor for U.S. and Asia Pacific Territories for USANA from February 2013 to December 2016.   CW1 was based in San Diego, California.

110.    CW1 stated that to become a distributor, she had to invest $500 in USANA products, which would appear to be a violation of China's 2005 law, and was then expected to sell to friends and whoever else she could find to buy it.

111.    As in a typical pyramid scheme banned by Chinese law, the next step involved recruiting more people to sell under you, CW1 said, noting that she never reached that stage.

112.    CW1 stated that after purchasing USANA's product, distributors weren't given much instruction, they were just expected to distribute the product line they were given through whatever means they saw fit move it.

113.    Chinese customs frequently confiscated shipments, CW1 said.

114.    The only ways to get product into mainland China was to find back channels or haul it yourself, CW1 said, stating that she called on social contacts in her community and found several local companies who were already shipping vitamins to China and used them.

115.    Commenting on the pressure placed on distributors, CW1 stated that they have sell at least a six-digit-figure worth of product-based profit.   CW1 said that a distributor's actual take depends on the mass of the pyramid.

116.    CW1, a Shanghai native, expressed the view that there is no law forbidding the use of MLM practices in China.

117.    CW2 was the executive director of information technology for USANA in its Salt Lake City, Uah warehouse from November 2006 to 2014.  CW2 first reported to Chief Operating Officer ("COO") Roy Truett, then, after Truett left, CW2 reported to Executive Director of Digital Marketing Rick Stambaugh.   Both Truett and Stambaugh reported to Co-CEO David Wentz.

118.    USANA's China market was managed by Hong Kong-based Deborah Woo ("Woo"), vice president of greater China and North Asia. Woo reported directly to USANA's board of directors, CW2 said.

119.    CW2 described Woo as a highly senior employee and said that she, Guest and Wentz all reported to USANA's board of directors and worked together with some frequency.

120.    CW3 served as the director of information technology for USANA from May 1998 to March 2000.  CW3 returned to the company in April 2003, working himself up to chief information officer, a position he held through May 2011, via positions as the vice president of information technology and the executive director of information technology. CW3 was promoted to COO in May 2011 and remained in that role through December 2012. In every position CW3 was based in Salt Lake City, Utah and reported to USANA CEO David Wentz.

121.    CW3 stated that BabyCare affiliates did, in fact, engage in network marketing.

122.    CW3 further stated that CEO David Wentz, Chief Financial Officer ("CFO") Jeff Yates and, later, CFO Paul Jones monitored sales in China very closely.  China was the most important thing USANA had going on – by far – and the Company's progress entering the

market was discussed during virtually every substantive interaction CW3 had with his C-level colleagues.

123.    CW3 stated that if USANA were not in China or if it had to leave China, there would be no business, given that USANA's business now is 80 to 90 percent China.

124.    When asked if CEO David Wentz and CFO Jones were aware of the volume of the Company's China sales on an ongoing basis, CW3 said they received daily reports each morning detailing global operations.

125.    CW3 attested to the existence of a daily report that comes out, every single day, built from business intelligence data via the central data warehouse.   This report shows enrollment volume, the volume of purchases and overall revenue within the market.   According to CW3, everybody in a C-level position received the report daily, at the beginning of the day, in an email generated via the data warehouse.

126.    The numbers were broken out by country, CW3 said, and each international location's computer system was set up to automatically send all its data to the data warehouse on an ongoing basis.

127.    CW3 stated that CEO Wentz and CFO Jones looked at the reports on a constant basis.  CW3 recalled that the reports came up frequently in discussions and meetings – they were the means of measuring how the company was doing everywhere in the world, and China was by far the most important piece of that picture.

128.    CW3 participated in numerous meetings, formal and informal, with CEO Wentz and China was discussed in virtually every interaction.

129.    CW3 also stated that executives at USANA were not particularly preoccupied with regulatory worries or the Chinese government.

130.    Every Tuesday, CW3 participated in the weekly executive meeting at 6 p.m. at the Utah corporate office. All the C-level executives, general managers and senior executives who were in the area attended, usually between ten and fifteen people in total.

131.    CW3 described China as a constant, recurring topic in these meetings, which were all about strategy and how to approach the market, leverage infrastructure, and make money in China.

132.    CW4 served as executive director of marketing for USANA from October 2013 to January 2017.   CW4 was based at the Company's headquarters in Salt Lake City, Utah and reported to Chief Marketing Officer Doug Braun.

133.    During his tenure at USANA, CW4 was in frequent contact with CEO David Wentz.

134.    CW4 regularly reviewed reports that were compiled for him using the Company's online business tool, Domo, an online tool for data aggregation, analysis and reporting, that created dashboards and made data easy to read and search. CW4 participated in numerous presentations where information about year-over-year growth by region had been captured and was provided.

135.    CW4 said that CEO Wentz and CFO Jones didn't just receive monthly or weekly reports on sales; that info was literally at their fingers at all times. That included information about sales in China.

136.    CW4 stated that this information was available via a Domo report at any time. Wentz and Jones could look at sales, new distributors, attrition of distributors and many other metrics.

## **Materially False and Misleading Statements Issued During the Class Period**

137.    The Class Period begins on March 14, 2014, the day after USANA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 28, 2013 (the "2013 10-K").  For the quarter, USANA reported net income of $20.28 million, or $0.71 per diluted share, on revenue of $186.27 million, compared to net income of $18.45 million, or $0.64 per diluted share, on revenue of $168.53 million for the same period in the prior year.  For 2013, USANA announced net income of $79.02 million, or $2.78 per diluted share, on revenue of $718.18 million, compared to net income of $66.43 million, or $2.23 per diluted share, on revenue of $648.73 million for 2012.

138.    In the 2013 10-K, USANA stated, in relevant part:

In 2013, we also announced our receipt of direct selling licenses in three additional provinces in Mainland China, and we announced plans to build a new, state-of-the-art manufacturing and production facility in Beijing, which we anticipate will become operational during the latter part of 2015. As part of our ongoing strategy in Greater China, we also continued registering USANA products in China, educating our customers on our product offerings and business model in China, and improving our information systems and infrastructure in China to make it easier for our customers to do business with us there.

. . .

Our most recent market expansions in [the Asia Pacific] region include our entry into Thailand in 2012 and our entry into Mainland China in 2010 (through our acquisition of BabyCare). Over the last several years, growth in this region had been led by Hong Kong and the Philippines. Since our acquisition of BabyCare, however, our strategy in Asia Pacific has been centered on generating growth in Mainland China. Consequently, our growth in Asia Pacific during 2013 was led by Mainland China, and our results in Hong Kong have declined. Additionally, our growth in the Philippines was disrupted during 2013 due to the challenging operating conditions in that market, which included natural disasters and political unrest. Going forward, we anticipate that Mainland China will continue to drive our growth in this region, but we also expect our business to grow in most of our other markets in this region as a result of the initiatives we introduced in 2013.

**Growth Strategy**

. . .

*Successfully Grow our Greater China and our Americas and Europe Regions.*
In light of the strength of our Asia Pacific region and our growing Associate base
in Asia, we believe that Greater China is the most significant and imminent
growth opportunity for us. Our strategy in this region is focused on generating
customer growth in each market, with an emphasis on China. We operate in China
through our wholly-owned subsidiary, BabyCare. BabyCare has been granted
licenses to engage in direct selling in the municipalities of Beijing, Jiangsu,
Shaanxi and Tianjin and is working to obtain similar licenses in other provinces.
We have spent the last few years registering a portfolio of USANA products for
sale by BabyCare in China, educating our customers on our product offering and
business model in China, and improving our information systems, technology and
infrastructure in China. During 2014, we will continue to execute these strategies,
with a focus on improving our systems and infrastructure in China to make it
easier and more enjoyable for customers to do business with us there. We have
announced our investment of approximately $40 million in a new, state-of-the-art
manufacturing and production facility in China, and we anticipate that this facility
will become operational during the latter-half of 2015. In 2014, we will also
renovate several of our branch locations in China to make them more modern and
customer-friendly.

139.    In the 2013 10-K, USANA further stated, in relevant part:

We continually monitor and review our Associates' compliance with our policies
and procedures as well as the laws and regulations applicable to our business
around the world. Part of this review entails an assessment of our Associates'
sales activities to ensure that Associates are actually selling products to
consumers. Our policies and procedures require Associates to present our
products and the USANA opportunity ethically and honestly.

140.    In the 2014 10-K, USANA also stated, in part:

Our business in China is that of BabyCare, a direct selling company that we
indirectly acquired several years ago to facilitate our expansion into China.
BabyCare's business model has been developed specifically for China in light of
its direct selling laws and regulations there. BabyCare has been granted licenses
from the Chinese government to conduct direct selling in four provinces in China
and will be required to obtain licenses from municipalities and provinces in China
where it does not hold a license.

141.    In addition, the 2013 10-K stated, in relevant part, that "BabyCare's business

model has been designed specifically for China based on a number of factors, including: (i)

BabyCare's communications with the Chinese government, (ii) BabyCare's interpretation of the

direct selling regulations, as well as their understanding of how the government interprets and enforces the regulations, and (iii) BabyCare's understanding of how other multinational direct selling companies operate in China."

142.   Finally, the 2013 10-K stated, in relevant part, "[f]urther, we require our partners, subcontractors, agents and others who work for us or on our behalf to comply with the FCPA and other anti-bribery laws. Although we have policies and procedures designed to ensure that we, our employees, our agents and others who work with us in foreign countries comply with the FCPA …."

143.   The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Wentz and Jones, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

144.   The statements referenced in ¶¶ 137-143 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part

the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

145.    On April 29, 2014, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 29, 2014 (the "Q1 2014 8-K").  For the quarter, USANA announced net income of $16.54 million, or $0.58 per diluted share, on revenue of $182.4 million, compared to net income of $17.78 million, or $0.64 per diluted share, on revenue of $169.08 million for the same period in the prior year.

146.    In the Q1 2014 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 13.0% to $118.6 million, compared with $104.9 million for the first quarter of the prior year. This improvement was due primarily to sales growth in the Greater China and Southeast Asia Pacific regions with China, Singapore and the Philippines experiencing the most meaningful growth. The Greater China region generated net sales growth in excess of 12% on a year-over-year basis. However, quarterly sequential sales for this region declined 1.1% due to the normal seasonality of the Chinese New Year, as well as the negative media and regulatory focus on businesses in the Company's industry during the quarter.

. . .

"As we anticipated, our business in several markets experienced the customary seasonal pressure of the Chinese New Year," continued Mr. Wentz. "Additionally, the challenging environment that emerged in China during the quarter impacted our sales and customer growth in that market. Although we believe that the environment in China will continue to impact our short-term performance in that market, we remain confident in our growth opportunity in China and will continue to invest and build a sustainable business there. We also remain confident in the underlying strength of our world-wide business, and we

expect the initiatives we put in place during 2013 will continue to drive long-term growth for the Company," concluded Mr. Wentz.

. . .

**Outlook**

. . .

Chief Financial Officer, Paul Jones, commented, "Although our first quarter results were impacted by a number of factors, we continue to expect our financial performance to accelerate as the year progresses. The pricing and Associate compensation plan initiatives we implemented in 2013, however, will continue to create a challenging year-over-year comparable for our financial performance. Additionally, we anticipate that the environment in China will continue to impact our growth in 2014 and have adjusted our outlook accordingly. We remain committed to growing our business in China and will continue to invest in this important market as part of our growth strategy. We will also continue to advance our personalization strategy around the world and leverage the initiatives we implemented during 2013 to drive long-term growth for the Company."

147.    The statements referenced in ¶¶ 145-146 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant

regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

148.    On April 30, 2014, the Company held its Fiscal Q1 2014 Earnings Conference Call (the "Q1 2014 Earnings Call").   During the Q1 2014 Earnings Call, Defendant Wentz stated:

> …. As previously noted, our top and bottom line results this quarter were impacted by the media and regulatory focus on companies in our industry in China. This impact was evident in several ways. First, because of the media and regulatory environment in our industry we saw our associates in the market begin to adopt a wait-and-see mentality for a portion of the quarter. Consequently, the number of sales meetings held in China during the quarter was greatly reduced. Beginning in April our number of sales meetings began to return to normal levels.
>
> Next, we experienced the softer direct selling market in China during the first quarter. The biggest impact followed Chinese New Year as our sales did not rebound to their normal run rate. We believe that much of this market softness is due to the increased media and regulatory focus in China on direct sales organizations.
>
> Additionally, due to the success of our China National Sales Conference last November which had record attendance. Many of our China associates unexpectedly chose not to attend our 2014 Asia-Pacific convention in Hong Kong. This led to a reduction in the seasonal boost that is typically linked to our Asia-Pacific convention.
>
> We believe that the challenging environment in China will continually impact our results for the next few quarters. As a best practice we continue to require that all sales meetings to be registered with the local government and continue to provide extensive training to our field management staff and sales leaders regarding our policies and procedures in China.
>
> We remain confident in our long-term growth opportunity in China and we'll continue to invest considerable time and resources in that country. In this regard, we will continue to improve our systems and infrastructure in China to make it easier and more enjoyable for customers to do business with us there.

149.    On the same call, Defendant Jones stated that:

Greater China as a whole generated nearly 12.5% sales growth on a year-over-year basis and associate counts increased 26.4%. On a sequential basis, however, top line results decreased modestly as a result of the Chinese New Year and the challenging environment in China.

….

Now, let's discuss our updated guidance. As Dave mentioned we anticipate that the challenging environment in China will impact our results for the next couple of quarters. Consequently, we now expect that net sales will be in the range of $770 million to $790 million for the year, compared to our previous guidance of $790 million to $810 million.

150.    Also on the Q1 2014 Earnings Call, Defendants Jones and Wentz had the following exchange with analyst Scott Van Winkle ("Van Winkle") of Canaccord Genuity:

**<Q - Scott Van Winkle>**: Okay. Great. And then on China, a few questions. I think Paul said that, Hong Kong was down significantly again. Obviously, you posted growth in the broader Greater China, so mainly it had to be up triple-digits again, is that right or can you give the number?

**<A - Paul A. Jones>**: Yes. We were up – let me get that real quick. But Mainland was up in the triple-digit year-over-year, significant. And we anticipate that again it will be another strong year even with the headwinds we're experiencing.

**<Q - Scott Van Winkle>**: Was the growth consistent? I think last quarter you were, I think it was like over 200% you were talking last quarter, is it kind of in the same range?

**<A - Paul A. Jones>**: Same range, yes.

**<Q - Scott Van Winkle>**: Okay. And then the publicity, Herbalife reported a couple of days ago, had very strong growth in Mainland China. It didn't really call out any impact from the publicity. Was there anything specific to BabyCare or USANA or was this all because of that paper's exposé on Nu Skin?

**<A - David A. Wentz>**: No. There was nothing specific to USANA, I think we're all just being conservative to – we want to see what we would have of Nu Skin and we're relieved to see the way things went there and made us more optimistic and excited about the future there.

**<Q - Scott Van Winkle>**: Yeah. I mean, you are talking about your meetings kind of returning to normal in April that kind of puts with Nu Skin kind of restarting its meetings at the end of April. Did you just pull back a little bit on the meetings or was it more distributor-lead saying that they'll pull back on meetings?

**<A - David A. Wentz>**: It was a combination of both. We all just kind of eased off. *We wanted to do – and we of course invested even more time and effort in training and making sure that everyone understood all the policies.* So it was a great time. It was a great opportunity for us to go back to all of those leaders and train them a second or a

third or a fourth time, because the attention – made them even more attentive and even greater attendance at training meetings. And there was fantastic opportunity to make sure that everyone understands the policies and they are doing things correctly. And so I think that took some time and effort to, of course, spending all that time making sure we did extra training and that can take away from sales meeting time. So I think it was a good opportunity. It was a good chance for us to remind and emphasize. And I think it was normal for most companies across the board that there were few less sales meetings and a few more training meetings to make sure that we are doing things correctly.

(Emphasis added).

151.    The statements referenced in ¶¶ 148-150 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China, indicating the Company's failure to successfully communicate "all the policies" necessary to ensure compliance; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

152.   On May 7, 2014, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended March 29, 2014 (the "Q1 2014 10-Q").

153.   The Q1 2014 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

154.   The statements referenced in ¶¶ 152-153 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

155.    On July 29, 2014, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended July 4, 2014 (the "Q2 2014 8-K").  For the quarter, USANA announced net income of $19.3 million, or $0.68 per diluted share, on revenue of $188.26 million, compared to net income of $24.21 million, or $0.86 per diluted share, on revenue of $189.14 million for the same period in the prior year.

156.    In the Q2 2014 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 1.8% to $124.6 million, compared with $122.4 million for the second quarter of the prior year. This improvement was due to nearly 14% sales growth in the Southeast Asia Pacific region, which was driven by sales and customer growth in every market in the region. Net sales in the Greater China region decreased 4.3% on a year-over-year basis, due to nearly $7.0 million in incremental sales during the second quarter of 2013 that occurred ahead of policy changes, which included restricting Associate purchases to their country of residence. Sequentially, net sales in the Greater China region increased 4.6% due to double-digit sales and customer growth in China. The number of active Associates in the Asia Pacific region increased by 16.9% year-over-year, due to double-digit Associate growth in the Greater China and Southeast Asia Pacific regions.

. . .

"Our business continues to produce strong results in Asia Pacific, as nearly every market in this region delivered sales and customer growth during the quarter. As we anticipated, our performance in China accelerated during the quarter and produced double-digit sales and customer growth compared to the prior quarter. We expect our results in China to continue to accelerate as the year progresses and remain confident in our long-term growth potential in this important market. We also have initiatives planned for the second-half of 2014 that are designed to drive sales and customer growth in each of our regions, with an emphasis on North America and the United States in particular. We look forward to hosting our 22nd Annual International Convention in August, where we will make several exciting announcements," concluded Mr. Wentz.

157.    The statements referenced in ¶¶ 155-156 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

158.    On July 30, 2014, the Company held its Fiscal Q2 2014 Earnings Conference Call (the "Q2 2014 Earnings Call").  During the Q2 2014 Earnings Call, Defendant Wentz stated:

> Now let's turn to our performance in China. Last quarter, our results were impacted by the media and regulatory focus on companies in our industry in China. While that impact certainly carried over to the beginning of the second quarter, our business in China began to accelerate as the quarter progressed.
>
> During the second quarter, China produced double-digit sales and customer growth sequentially, and triple-digit sales and customer growth on a year-over-year basis. This growth was not immediately apparent in our regional results because this was offset by a sales decline in Hong Kong. The decline in Hong Kong, however, was magnified by the almost $7 million in sales that occurred in that market ahead of the policy changes last year. China performed well during the quarter, and we expect this market to continue to accelerate as the year progresses.

159.    On the same call, Defendant Guest stated that:

Finally, we expect our Asia-Pacific region to continue to grow, and in particular, expect our results in China to continue to accelerate as the year progresses. As we remain focused on executing these 2014 strategies and sharing our world-class products with as many people as possible, I'm confident that our financial performance will continue to accelerate and fully expect 2014 to be another year of record results for USANA.

160.    Next, Defendant Jones stated that:

As Dave mentioned a moment ago, Mainland China continued to make a significant contribution to the growth in the Asia-Pacific region with triple-digit sales and customer growth on a year-over-year basis. This was offset by by the anticipated decrease in sales in Hong Kong, which was magnified by the incremental sales increase we experienced during the second quarter of last year prior to our policy changes. Although sales in Greater China as a whole decreased year-over-year, Associate counts did increase 21.4%.

161.    Defendants Jones and Wentz then had the following exchange with Van Winkle:

**<Q - Scott Van Winkle>**: Great. Thanks. And then, if I could turn to China, you mentioned the media attention around direct selling that popped up in Q1 had an impact at the beginning of Q2. Recently, there's been a little more media attention, specific to USANA, has that had any impact here early in Q3?

**<A - Paul A. Jones>**: We've seen a little bit of minor impact as you've seen in stock pressure, but as far as the activity in China, we have a very strong team over there that, immediately when those kinds of things happen, they get out to the field and help them to focus on the business and not the garbage that is in the media. ***We also proactively reach out to regulators and to our employees to make sure everybody is getting accurate information***. And so it's been – actually, I think a very positive thing for us and we look forward to the future. We think China again is very strong for us.

**<Q - Scott Van Winkle>**: Great. And then try to help us measure the transition that's happened over in Greater China over the last year. Can you give us any metrics about the mix between Hong Kong and Greater China either in dollar or as a percentage of sales or anything like that to break down that Greater China region?

**<A - Paul A. Jones>**: Yeah. Let's – let me take a look real quick maybe to help out a little bit. We're certainly seeing the – ***as we anticipated the decreases in Hong Kong, but they're more than being offset by the growth in Mainland China***. And if we're looking at – we're getting some specific numbers here. But looking at the enrollments, the people that are coming into the business, it's very strong. We have seen about 143% increase in our sales in Mainland China

with a double-digit decrease in Hong Kong. So, we're looking good in that area.

**<Q - Scott Van Winkle>**: And that was a Q2 number?

**<A - David A. Wentz>**: Yes.

(Emphasis added).

162.    Also during the call, Defendants Jones and Wentz had the following exchange

with analyst Frank Camma ("Camma") from Sidoti:

> **<Q - Frank A. Camma>**: Just a follow-up on the China situation here … you had, last
>
> quarter, mentioned a negative media on direct sellers there. I was just wondering, in your opinion, I mean, is one of the -- if you just had to pick one of these between the negative media or the policy change going forward, what's going to have the greater lasting impact on your sales results there?
>
> **<A - Paul A. Jones>**: *The greatest lasting impact on our business in China will be us continuing to have strong relations with the regulators, which we do. And we are in constant contact with them to ensure that we're constantly working towards the best practice in direct selling in China*. The impact of the media issue that certainly has a short-term effect on the share price, I think the more that happens, the more just becomes noise out there. And we've – the information that's being fed to the newspapers is researched and funded by short sellers, so we understand their intent on all of that and we believe that the impact will be more driven by what Wall Street pays attention to as opposed to what our Associates pay attention to, because they are out there working and we're keeping them focused. *So I think the bigger issues would be us trying to continue, as we will do work towards best practices in all aspects of our China business*.
>
> **<Q - Frank A. Camma>**: Okay. And so we obviously only get the translation of these articles in the headline news and what you're accused of doing there. So just to be clear, the company's position is, you haven't been contacted by any regulators that you've been doing anything out of what you're able to legally do in that market, is that correct?
>
> **<A - Paul A. Jones>**: *That's correct. We've not been contacted by any regulatory agencies. We proactively work with them to make sure that we're doing things the way that they would like us to do*.
>
> **<Q - Frank A. Camma>**: Okay. And obviously, for a number of years, Hong Kong was a very important market. Just wondering if you could quantify at what point does that stabilize in your model? Where do you see that kind of – it's probably going to be an important market going forward, but where does it – where does sales kind of – is it a timeframe? Is it a level? I'm just trying to quantify that in our projections.
>
> **<A - David A. Wentz>**: Well, Hong Kong is a fairly small market population wise. And so...
>
> **<Q - Frank A. Camma>**: Right.

**<A - David A. Wentz>**: We believe it will be, I mean, if you were to compare it to other markets at the same population size, we expect it to be more successful than a number of them. But there will be a level that hits it right, that matches the market size and number of leaders that we have there. But a lot of focus has moved from Hong Kong to China, as we all know, and that's where a much bigger opportunity is. So, we look forward to a nice base in Hong Kong, but China is absolutely our future and where a huge amount of opportunity with the population size and our just scratching the surface penetration and just getting started. So we hope it will level off by the end of this year.

**<Q - Frank A. Camma>**: Okay.

(Emphasis added).

163.    The statements referenced in ¶¶ 158-162 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China, and as such were not working with regulators toward best practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) Contrary to Jones's reassurance to the contrary, BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties;

and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

164. On August 5, 2014, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended July 4, 2014 (the "Q2 2014 10-Q").

165. The Q2 2014 10-Q added that:

> The decline in net sales in Greater China was the result of a 66.5% decrease in net sales in Hong Kong, which was partially offset by triple-digit sales growth in mainland China. Notably, the decrease in Hong Kong includes an estimated $7.0 million in incremental sales generated ahead of a worldwide policy that we implemented during the second quarter of 2013 (restricting Associate purchases to in-market purchases only) ….

166. The Q2 2014 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

167. The statements referenced in ¶¶ 164-166 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control,

authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

168.   On October 28, 2014, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended September 27, 2014 (the "Q3 2014 8-K").   For the quarter, USANA announced net income of $19.5 million, or $0.74 per diluted share, on revenue of $191.94 million, compared to net income of $16.75 million, or $0.58 per diluted share, on revenue of $173.69 million for the same period in the prior year.

169.   In the Q3 2014 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 21.3% to $130.2 million, compared with $107.4 million for the third quarter of the prior year, and increased 4.5% sequentially. The year-over-year increase was due to 29.2% sales growth in the Greater China region and 10.6% sales growth in the Southeast Asia Pacific region. Sales growth in Greater China was driven by double-digit sales and customer growth in Mainland China, while sales growth in Southeast Asia Pacific resulted from strong sales and customer growth in Australia/New Zealand, the Philippines and Thailand. The number of active Associates in the Asia Pacific region increased by 28.2% year-over-year, due primarily to double-digit Associate growth in the Greater China and Southeast Asia Pacific regions.

170.   The statements referenced in ¶¶ 168-169 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

171.    On November 29, 2014, the Company held its Fiscal Q3 2014 Earnings Conference Call (the "Q3 2014 Earnings Call").  During the Q3 2014 Earnings Call, Defendant Guest stated that "[t]he third quarter of 2014 was another successful quarter for USANA. Net sales increased by 10.5% to $191.9 million on a year-over-year basis."

172.    On the same call, Defendant Jones and Van Winkle had the following exchange:

**<Q - Scott Van Winkle>**: Okay. Great. And then on greater China, can you talk a little bit about the differential between associate growth and revenue growth, and is that a function of Hong Kong declining and China growing? Is there a difference between the two markets on productivity or just help me put those two together?

**<A - Paul A. Jones>**: Yes. There is – it is a difference between the Hong Kong. We've seen, over the years, some significant decline there. Anticipate we'll see over the next couple quarters still some additional decline as we see Mainland

China continue to grow and anticipate some healthy growth there as well going forward. And there are some differences in productivity. And if you look at our overall productivity company-wide, you'll notice that it's down a little bit. But that really doesn't – what that's meaning is we're having greater volume of sales in China and China, in particular, is a market you see a lower productivity rate per active customer. It's about two-thirds of what you'd see in the rest of the world. And So, that is some of the drag on it.

**<Q - Scott Van Winkle>**: Is there a reason why that's the case? Is it the different product mix in that market?

**<A - Paul A. Jones>**: Not So, much. Product mix may have something to do with it. But really, I think, it has more to do with just the socioeconomic of the conditions, the market conditions, their buying patterns are different.

173.    Subsequently, Defendant Hekking had the following exchange with Tim Ramey

("Ramey") of Pivotal Research Group:

**<Q - Timothy S. Ramey>**: …. So, how have you thought about … the implications for your relationship with the government?

**<A - G. Douglas Hekking>**: Yes. ***Our China management team is very close with their government regulators.*** There's constantly discussion about those types of things, making sure that all of our meetings are registered and looked at prior and there are certain restrictions and regulations that they have for that. And So, we work very closely with them to follow that. And I think in time in China, the indication is that you'll see the government being more clear on some of their expectations on how big those meetings can be and what those meetings are about? But we're staying – our ***China management team is staying very close on with the [ph] SEIC (0:25:55) and regulators regarding that***.

**<Q - Timothy S. Ramey>**: Great. And then just a question on Hong Kong. It will be pretty interesting when Hong Kong kind of finds its bottom and stops diluting the growth rate in greater China. Do you have any thoughts on when that occurs? When Hong Kong kind of gets to a stable level of sales that reflect just ongoing operations in Hong Kong?

**<A - G. Douglas Hekking>**: Yeah. We believe that over the next couple of quarters, we'll really see that find its place.

(Emphasis added).

174.    Finally, Defendant Jones stated as follows:

I'm confident that we're going to see a resurgence as we continue to be more relevant in a market that is ever changing. It is true that in Asia, especially with direct sales, that it lends itself very nicely to our business model and business culture, because they were typically within their families. Direct sales is very natural for them in that culture and that's why it takes off so well. There is some appeal, great appeal in Asia actually for products that are manufactured in the

United States, as we operate and function here. And as we look at what's happening around the world, we attribute some of the allure, or I should say the success to us, is that we are based and manufacture out of the United States. And you'll see other companies, multi-billion dollar companies, that have a base of operations in United States that do a huge significant amount of business overseas and we are not dissimilar.

Although, as that market grows, and specifically China becomes its own animal and becomes bigger and bigger, a bigger force, we are certainly open to them looking at China becoming more of its directional entity, meaning not one size fits all. So, as we do a worldwide promotion, maybe China would have different sale strategies in place, as it relates to China, specifically Mainland China being its own operation.

175.   The statements referenced in ¶¶ 171-174 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China, and as such was not "close" with local regulators; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as

civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

176.    On November 6, 2014, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2014 8-K and reporting in full the Company's financial and operating results for the quarter ended September 27, 2014 (the "Q3 2014 10-Q").

177.    The Q3 2014 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

178.    The statements referenced in ¶¶ 176-177 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the

foregoing, USANA's public statements were materially false and misleading at all relevant times.

179.    On February 10, 2015, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended January 3, 2015 (the "2014 8-K").  For the quarter, USANA announced net income of $21.3 million, or $0.83 per diluted share, on revenue of $227.87 million, compared to net income of $20.28 million, or $0.71 per diluted share, on revenue of $186.27 million for the same period in the prior year.  For 2014, USANA announced net income of $76.64 million, or $2.80 per diluted share, on revenue of $790.47 million, compared to net income of $79.02 million, or $2.78 per diluted share, on revenue of $718.18 million for 2013.

180.    In the 2014 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 34.1% to $163.3 million, compared with $121.8 million for the fourth quarter of the prior year. Net sales also increased by 25.4% on a sequential quarter basis. The year-over-year increase was due to 45.1% sales growth in the Greater China region, 18.8% sales growth in the Southeast Asia Pacific region, and 16.1% sales growth in the North Asia region. Sales growth in Greater China was driven by double-digit sales and customer growth in Mainland China, while sales growth in Southeast Asia Pacific resulted from double-digit sales and customer growth in the Philippines, Australia/New Zealand, Malaysia and Thailand. Sales growth in North Asia was driven by double-digit sales and customer growth in South Korea. The number of active Associates in the Asia Pacific region increased by 44.3% year-over-year, and increased 26.3% sequentially.

181.    The statements referenced in ¶¶ 179-180 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing

practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

182.    On February 11, 2015, the Company held its Fiscal Q4 2014 Earnings Conference Call (the "Q4 2014 Earnings Call").  During the Q4 2014 Earnings Call, Defendant Jones and Ramey had the following exchange:

> **<Q - Timothy S. Ramey>**: And just a follow-on on China, which also was stunning – up over, I think, 40% in the quarter. You kind of mentioned the Chinese New Year and other companies have called out that that might be a headwind that it ends at month end. Do you see Chinese New Year playing a role in first quarter sales? Should we expect a more moderated growth rate, I assume, in the 1Q? And any comments about the continuance of China's torrential growth?

> **<A - Paul A. Jones>**: Yes, we, as we have seen for the last several years, anticipate a challenge due to Chinese New Year and the greater that part becomes to our market, not only in China, but in other markets around the world, where we have a large group that celebrates the Chinese New Year. We anticipate that that will put some pressure on the top line in the first quarter, which will make our sequential quarter-over-quarter comparisons very difficult. Also along with that is the impact of the FX, the strengthening of the dollar. So that will also put some pressure in our comparatives. ***As far as our outlook going forward in China, we still see strong momentum there and we believe that it will continue to build through the year and we anticipate that we'll see strong double-digit growth again this year***.

> (Emphasis added).

183.   The statements referenced in ¶ 182 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

184.   On March 17, 2015, USANA filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2014 8-K and reporting in full the Company's financial and operating results for the quarter and year ended January 3, 2015 (the "2014 10-K").

185.   In the 2014 10-K, USANA stated, in part:

Asia Pacific is our most strongly growing region. Our most recent market expansions in this region include our entry into Thailand in 2012 and our entry into China in 2010 (through our acquisition of BabyCare). Historically, our growth in this region was led by Hong Kong and the Philippines. Since our acquisition of BabyCare, however, our strategy in Asia Pacific has been centered on generating growth in China. Consequently, our growth in Asia Pacific over the last couple of years has been led by China, and our

results in Hong Kong have declined. Going forward, we anticipate that China and the Philippines will continue to drive our growth in this region, but we also expect our business to grow in most of our other markets in this region. Additionally, we plan to open a new market in our Southeast Asia Pacific region during 2015.

. . .

**Growth Strategy**

. . .

*Successfully Grow our Greater China and our Americas and Europe Regions.*   In light of the strength of our Asia Pacific region and our growing Associate base in Asia, ***we believe that Greater China is the most significant and imminent growth opportunity for us***. Our strategy in this region is focused on generating customer growth in each market, with an emphasis on China. We operate in China through our wholly-owned subsidiary, BabyCare. BabyCare has been granted licenses to engage in direct selling in the municipalities of Beijing, Jiangsu, Shaanxi and Tianjin and is working to obtain similar licenses in other provinces. We have spent the last few years registering a portfolio of USANA products for sale by BabyCare in China, educating our customers on our product offering and business model in China, and improving our information systems, technology and infrastructure in China. In 2015, we will continue to execute these strategies, with a focus on the construction of our new state-of-the-art manufacturing and production facility, which we anticipate will become operational during the first half of 2016. We will also continue re-finishing our China branch facilities to make them more modern and customer-friendly, and we will open several new branch locations.

(Emphasis added.)

186.    In the 2014 10-K, USANA further stated, in part:

    We continually monitor and review our Associates' compliance with our policies and procedures as well as the laws and regulations applicable to our business around the world. Part of this review entails an assessment of our Associates' sales activities to ensure that Associates are actually selling products to consumers. Our policies and procedures require Associates to present our products and the USANA opportunity ethically and honestly.

187.    In the 2014 10-K, USANA also stated, in part:

Our business in China is that of BabyCare, a direct selling company that we indirectly acquired several years ago to facilitate our expansion into China. BabyCare's business model has been developed specifically for China in light of its direct selling laws and regulations there. BabyCare has been granted licenses from the Chinese government to conduct direct selling in four provinces in China

and will be required to obtain licenses from municipalities and provinces in China where it does not hold a license.

188.    In addition, the 2014 10-K stated, in relevant part, that "BabyCare's business model has been designed specifically for China based on a number of factors, including: (i) BabyCare's communications with the Chinese government, (ii) BabyCare's interpretation of the direct selling regulations, as well as their understanding of how the government interprets and enforces the regulations, and (iii) BabyCare's understanding of how other multinational direct selling companies operate in China."

189.    The 2014 10-K also stated, in relevant part, "[f]urther, we require our partners, subcontractors, agents and others who work for us or on our behalf to comply with the FCPA and other anti-bribery laws. Although we have policies and procedures designed to ensure that we, our employees, our agents and others who work with us in foreign countries comply with the FCPA …."

190.    Finally, in the 2014 10-K, USANA stated, in part:

Historically, our growth in this region was led by Hong Kong and the Philippines. Since our acquisition of BabyCare, however, our strategy in Asia Pacific has been centered on generating growth in China. Consequently, our growth in Asia Pacific over the last couple of years has been led by China, and our results in Hong Kong have declined. Going forward, we anticipate that China and the Philippines will continue to drive our growth in this region, but we also expect our business to grow in most of our other markets in this region.

191.    The 2014 10-K contained signed certifications pursuant to SOX by Wentz and Jones, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

192.    The statements referenced in ¶¶ 184-191 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

193.    On May 5, 2015, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended April 4, 2015 (the "Q1 2015 8-K").  For the quarter, USANA announced net income of $19.68 million, or $0.75 per diluted share, on revenue of $219.38 million, compared to net income of $16.54 million, or $0.58 per diluted share, on revenue of $182.4 million for the same period in the prior year.

194.    In the Q1 2015 8-K, USANA stated, in part:

**Financial Performance**

For the first quarter of 2015, net sales increased by 20.3% to $219.4 million, compared with $182.4 million in the prior-year period. The increase in net sales was driven by 41.9% growth in the number of active Associates, largely as a result of strong Associate growth in the Company's Asia Pacific region. Net sales, on a comparative basis, were positively impacted by: (i) continued momentum from the incentive program that the Company offered during the fourth quarter of 2014, which carried over for several weeks into the first quarter of 2015 in China, (ii) incremental sales that occurred ahead of price increases announced in China during the quarter, and (iii) a more favorable operating environment in China compared to the prior-year period. The Company estimates that the incremental sales ahead of the price increases in China contributed approximately $12 million to net sales for the quarter. Net sales, on a comparative basis, were negatively impacted by $9.2 million due to a strengthening U.S. dollar.

. . .

"The first quarter was an excellent start to another promising year for USANA," said Kevin Guest, USANA's President. "Our results for the quarter were better than expected, notwithstanding the typical pressure from the Chinese New Year and continued headwinds from a strengthening U.S. dollar. As reported, our double-digit sales, earnings and customer growth during the quarter were driven by the strong momentum *we continue to see across our business and higher-than-expected sales in China*.

. . .

**Regional Results**

Net sales in the Asia Pacific region increased by 31.4% to $155.9 million, compared with $118.6 million for the first quarter of the prior year. This year-over-year increase can be attributed to 43.0% sales growth in the Greater China region, 12.1% sales growth in the Southeast Asia Pacific region, and 26.6% sales growth in the North Asia region. Sales growth in Greater China was driven by triple-digit sales and customer growth in Mainland China, while growth in Southeast Asia Pacific resulted from double-digit sales and customer growth in most markets in that region. Finally, sales growth in North Asia was driven by double-digit sales and customer growth in South Korea. The number of active Associates in the Asia Pacific region increased by 58.5% year-over-year, and increased 9.8% sequentially. Net sales in the Asia Pacific region were negatively impacted by $5.5 million, on a year-over-year comparative basis, due to a strengthening U.S. dollar.

. . .

We continue to see strong sales and customer growth in most of our markets worldwide and expect this momentum to continue during 2015," continued Mr.

Guest. "While ***China continued to lead the way***, it is noteworthy that we generated double-digit growth in many of our markets around the world. Customer growth continues to be our primary objective, as we focus on improving the overall health and nutrition of individuals and families around the world."

(Emphasis added).

195.    The statements referenced in ¶¶ 193-194 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

196.    On May 6, 2015, the Company held its Fiscal Q1 2015 Earnings Conference Call (the "Q1 2015 Earnings Call").

197.    During the Q1 2015 Earnings Call, Defendant Jones had the following exchange

with Ramey:

> **Timothy S. Ramey>**: Good morning and congratulations on just an outstanding
> number. The Chinese performance was stunning in a lot of ways. And I guess it
> raises some levels of concern, both in terms of wrapping against that promotion as
> we go into next year, as well as kind of the sustainability of the average actives
> into the next couple of quarters. How do you think about that? I mean is it
> reasonable to think that some of that growth ebbs away in 2Q and 3Q and then
> maybe builds back in the 4Q or how are you thinking about that?
>
> **<A - Paul A. Jones>**: Well, we certainly, as we look at that first quarter, had
> slightly stronger than expected participation in the promotion that we ran, very
> excited about that and it did accomplish what we were hoping to. And as we
> mentioned, the $12 million buy ahead in terms of the price changes that we
> announced and so we saw that happen.  ***But if you back that out, we still
> anticipate seeing some good growth through the year in that market and
> continue to see positive things happening through the end of the year***.
>
> **<Q - Timothy S. Ramey>**: I mean it seems obvious that there will be growth, but
> sequentially, would we be prudent to kind of think of, I mean the 2Q being down
> versus the 1Q almost seems like a lock to me, but I'd love to hear your thoughts
> on that? I mean relative to China alone.
>
> **<A - Paul A. Jones>**: ***Yeah, well China, we still anticipate some strong growth***.
> We have some things that we'll be introducing in there over the next several
> quarters, but I think if you back some of those things out that we've talked about,
> then you can look at a consistent strong run rate as we go through the end of those
> two quarters. We'll see $5 million carry forward from that buy ahead that will go
> into the second quarter. So there will be some impact there. And then, you'll see a
> further consistent growth forward.
>
> (Emphasis added).

198.    The statements referenced in ¶¶ 196-197 were materially false and misleading

because Defendants made false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operational and compliance policies.

Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:

(i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing

practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the

Company's transactions and dispositions of assets; (iii) the Company failed to devise and

maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

199.    On May 13, 2015, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended April 4, 2015 (the "Q1 2015 10-Q").

200.    The Q1 2015 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

201.    The statements referenced in ¶¶ 199-200 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and

maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

202.    On August 4, 2015, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended July 4, 2015 (the "Q2 2015 8-K").  For the quarter, USANA announced net income of $25.42 million, or $0.96 per diluted share, on revenue of $233.24 million, compared to net income of $19.3 million, or $0.68 per diluted share, on revenue of $188.26 million for the same period in the prior year.

203.    In the Q2 2015 8-K, USANA stated, in part:

**Financial Performance**

For the second quarter of 2015, net sales increased to $233.2 million, up 23.9% compared with $188.3 million in the prior-year period. The increase in net sales was driven by 40.3% growth in the number of active Associates and 15.2% growth in the number of Preferred Customers. Also included in net sales for the quarter is $5 million in revenue that was deferred during the previous quarter in connection with price increases in China. Fluctuations in currency exchange rates negatively impacted net sales by $9.7 million due to the strengthening of the U.S. dollar.

. . .

**Regional Results**

Net sales in the Asia Pacific region increased by 35.4% to $168.7 million, compared with $124.6 million for the second quarter of the prior year. Sales grew 51.6% in the Greater China region, 7.8% in the Southeast Asia Pacific region and 32.4% in the North Asia region. Sales growth in Greater China was driven by strong customer growth in Mainland China, while growth in Southeast Asia Pacific resulted from customer growth within each market in the region. Finally, sales growth in North Asia was driven by double-digit customer growth in South Korea.

. . .

"Although currency remains a headwind, our business continues to generate solid worldwide growth," continued Guest. "While ***Mainland China continues to lead the way***, it is noteworthy that USANA generated both sales and customer growth in nearly every market around the world, which reflects the demand for our best-in-class products and business opportunity. During the quarter, we held our annual Asia Pacific convention in Singapore, where thousands of our Associates celebrated their success and received additional training. Later this month, we will hold our annual International Convention in Salt Lake City, where we also expect record attendance and another amazing event."

(Emphasis added).

204.    The statements referenced in ¶¶ 202-203 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part

the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times

205.    On August 5, 2015, the Company held its Fiscal Q2 2015 Earnings Conference Call (the "Q2 2015 Earnings Call").

206.    During the Q2 2015 Earnings Call, Defendant Jones stated as follows:

First, net sales came in at over $233 million, representing a 23.9% increase from a year ago. The majority of this growth came by way of Mainland China, where sales increased 84.4% and active associates increased 98% year-over-year. *While success in China continues to be our primary driver of growth*, I want to point out that we generated sales and customer growth in nearly all of our markets around the world during the quarter.

207.    On the same call, Defendant Jones had the following exchange with Van Winkle:

**<Q - Scott Van Winkle>**: Okay. And then turning to China, I mean, you talk about still benefiting from the promotion back in Q4 and Q1. Is there something about that promotion that kind of tail on it, that drove activity and continues to drive it for a couple of quarters or is it simply the fact that you built a bunch of momentum and now you're feeding off the momentum? I think you know what I mean there like you might have some volume commitment for 180 days or something to get an incentive. Is there something structurally that drives a tail on that promotion or is it just the momentum?

**<A - Paul A. Jones>**: *It's really just the momentum*. We did run a small promotion in the second quarter that helped with that. And we'll continue to look at small, regional promotions that will drive that. *But it really was just a momentum that carry forward as we saw the increase in associate counts, active customer counts having that effect exponentially has been positive*.

**<Q - Scott Van Winkle>**: And what's working, is it sales incentives, sell something get an iPad or is it compensation tweaks? What is it that's really working?

**<A - Paul A. Jones>**: It really, really is a couple of things. *One of them is, in China in particular, we have a strong team that's doing meetings on a very regular basis. And the momentum that's generated through those meetings is meaningful*. And so you get the excitement of the people that are out talking. So we're doing a lot of those. *It has to do with the quality of the product and the*

**brand image that's out there with that product**, as well as compensation plan around the world is one of the best compensation plans in the space.

(Emphasis added).

208. The statements referenced in ¶¶ 205-207 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

209. On August 12, 2015, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended July 4, 2015 (the "Q2 2015 10-Q").

210.    The Q2 2015 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

211.    The statements referenced in ¶¶ 209-210 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times

212.    On November 3, 2015, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended October 3, 2015 (the "Q3 2015 8-K").  For the quarter, USANA announced net income of $25.61 million, or $0.96 per diluted share, on revenue of $233.29 million,

compared to net income of $19.5 million, or $0.74 per diluted share, on revenue of $191.94 million for the same period in the prior year.

213.    In the Q3 2015 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 29.1% to $168.2 million, despite a negative impact of $11.8 million due to the strengthening of the U.S. dollar. Southeast Asia Pacific incurred 65% of the total impact of currency fluctuations. Sales increased 45.5% in the Greater China region, 3.3% in the Southeast Asia Pacific region, and 16.3% in the North Asia region.

Sales growth in Greater China was driven by strong customer growth in Mainland China, while growth in Southeast Asia Pacific resulted from double-digit customer growth in nearly every market in the region. Finally, sales growth in North Asia was driven by 50% customer growth in South Korea. The number of active Associates in the Asia Pacific region increased by 51.2% year-over-year, and 2.6% sequentially.

. . .

"Our consistent growth reflects the demand for USANA's best-in-class products and rewarding business opportunity," said Kevin Guest, USANA's Co-CEO. "During the quarter, we held our annual International Convention in Salt Lake City where we celebrated the achievements of our Associates with a record number of attendees. During the fourth quarter, we will officially open Indonesia, our 20th market, and hold our China National Meeting. Mainland China continues to be a key driver of our growth and we anticipate another amazing event with record attendance."

214.    The statements referenced in ¶¶ 212-213 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and

maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

215.    On November 4, 2015, the Company held its Fiscal Q3 2015 Earnings Conference Call (the "Q3 2015 Earnings Call").

216.    During the Q3 2015 Earnings Call, Defendant Jones had the following exchange with Camma:

> **<Q - Frank Camma>**: Hey. Could you – obviously, China, I mean, the numbers were amazing, but could you just talk a little more color on what you're seeing from your guys on the ground there as to respects of what impact the whole economic disruption is causing?
> **<A - Paul A. Jones>**: Yeah. ***We still see the momentum in the business there*** and while – as we've talked in the past that this industry and this business tends to be less affected by macro events than others, in fact, we can sometimes see positive growth in our industry when macro business starts to struggle a little bit. So we're not seeing a huge impact.

217.    The statements referenced in ¶¶ 215-216 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing

practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

218.    On November 12, 2015, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2015 8-K and reporting in full the Company's financial and operating results for the quarter ended October 3, 2015 (the "Q3 2015 10-Q").

219.    The Q3 2015 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

220.    The statements referenced in ¶¶ 218-219 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing

practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

221.    On February 9, 2016, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter and year ended January 2, 2016 (the "2015 8-K").  For the quarter, USANA announced net income of $23.97 million, or $0.92 per diluted share, on revenue of $232.59 million, compared to net income of $21.3 million, or $0.83 per diluted share, on revenue of $227.87 million for the same period in the prior year.  For 2015, USANA announced net income of $94.67 million, or $3.59 per diluted share, on revenue of $918.5 million, compared to net income of $76.64 million, or $2.80 per diluted share, on revenue of $790.47 million for 2014.

222.    In the 2015 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 5.4% to $172.1 million, despite a negative $11.2 million impact from the strengthening U.S. dollar, and an extra week of sales in the prior year quarter. Within Asia Pacific, net sales:

- Increased by 10.9% in Greater China (15.1% on a constant currency basis);

- Increased by 13.5% in the North Asia region (20.7% on a constant currency basis); and

- Decreased by 7.5% in the Southeast Asia Pacific region (increased by 4.8% on a constant currency basis).

Sales growth in Greater China was driven by 46.6% Associate growth in Mainland China, while sales growth in North Asia resulted from 33.3% Associate growth in South Korea. Finally, customer growth in Southeast Asia Pacific was primarily due to 30.8% Associate growth in Malaysia. The total number of active Associates in the Asia Pacific region increased by 26.1% year-over-year and 5.4% sequentially.

. . .

"***Our growth continues to be driven by momentum in our Asia Pacific region, particularly in Mainland China***," continued Mr. Wentz. "During the quarter, we held our annual China National Meeting in Qingdao, where a record number of Associates were recognized for their achievements. In addition, we officially launched our 20th market in Indonesia during the quarter. We are optimistic about this market for the future. We're also encouraged by the Associate growth that we are experiencing worldwide, and we expect this to continue during 2016."

(Emphasis added.)

223.    The statements referenced in ¶¶ 221-222 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying

with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

224.    On February 10, 2016, the Company held its Fiscal Q4 2015 Earnings Conference Call (the "Q4 2015 Earnings Call").  During the Q4 2015 Earnings Call, Defendant Wentz had the following exchange with Ramey:

> **<Q - Timothy S. Ramey>**: A couple of areas that I'm interested in. Can you comment – I mean, we've had four quarters of 40%-plus growth in China. I understand the extra week comp and so on, but was there anything that you would describe as deceleration in the business for the fourth quarter or is this just the variability of the business?

> **<A - David A. Wentz>**: Well, I definitely think that we have a strategy that requires us to get a lot more infrastructure in place before we step on the gas any harder. We've had some amazing growth in China and we don't want to be one of those companies that grows too fast, outgrows their ability to take care of their customers, do things correctly and so we are just allowing things to go organically while we get the IT systems up to greater speed, while we get the manufacturing facility up and running, so that we can support further growth and we are working on building our management team. We've grown so quickly from where we were five years ago that we have a lot to put in place to make sure that we are delivering that USANA quality levels. ***And so, while we have not been putting our foot on the gas, we're still growing nicely just with that organic growth***. Once we get everything in place, then we're excited to once again put more initiatives, focus more initiatives to get that growth at higher levels, but doing it now for us seems premature and dangerous to push really hard now to grow when we have so much to put in place to support future growth.

> So we're happy with the growth levels now. We think they are at the level they should be for this year, but I don't believe that they will be the growth levels in future years, once the infrastructure is in place, so we can push harder to get them growing faster.

> (Emphasis added).

225.    The statements referenced in ¶ 224 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct, were unlikely to be sustainable, and could not fairly be characterized as "organic"; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

226.    On March 1, 2016, USANA filed an Annual Report on Form 10-K with the SEC, reiterating the financial and operating results previously announced in the 2015 8-K and reporting in full the Company's financial and operating results for the quarter and year ended January 2, 2016 (the "2015 10-K").

227.    In the 2015 10-K, USANA stated, in part:

Asia Pacific has driven our growth the last several years. Our most recent market expansions in this region include our entry into Indonesia in late 2015, Thailand in 2012 and our entry into China in 2010 through our acquisition of BabyCare. Historically, our growth in this region was led by Hong Kong and the Philippines.

Since our acquisition of BabyCare, however, our strategy in Asia Pacific has been centered on generating growth in China. Consequently, our growth in Asia Pacific over the last few years has been led by China, and our results in Hong Kong have declined. ***Our Hong Kong market has now reached our projected size, in terms of customers and sales, and we anticipate modest organic growth for this market going forward***. We also anticipate that China and the Philippines will continue to drive our growth in this region going forward, but expect our business to grow in most of our other markets in this region.

. . .

**Growth Strategy**

. . .

*Successfully Grow each of our Regions through Market Specific Strategies and Incentives.*    In light of the strength of our Asia Pacific region and our growing Associate base in Asia, ***we believe that Greater China continues to be the most significant and imminent growth opportunity for us***. Our strategy in this region is focused on generating customer growth in each market, with an emphasis on China. Our wholly-owned subsidiary, BabyCare, is our operating entity in China. BabyCare has been granted licenses to engage in direct selling in the municipalities of Beijing, Jiangsu, Shaanxi and Tianjin and is working to obtain similar licenses in other provinces. We have spent the last few years registering a portfolio of USANA products for sale by BabyCare in China, educating our customers on our product offering and business model in China, and improving our information systems, technology and infrastructure in China. In 2016, we will continue to execute these strategies and finalize our new state-of-the-art manufacturing and production facility, which we anticipate will become operational during the first half of 2016.

(Emphasis added.)

228.    The 2015 10-K contained signed certifications pursuant to SOX by Wentz and Jones, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

229.    The 2015 10-K further stated, in relevant part:

We continually monitor and review our Associates' compliance with our policies and procedures as well as the laws and regulations applicable to our business around the world. Part of this review entails an assessment of our Associates' sales activities to ensure that Associates are actually selling products to

consumers. Our policies and procedures require Associates to present our products and the USANA opportunity ethically and honestly.

230.    The 2015 10-K also stated, in relevant part:

Our business in China is that of BabyCare, a direct selling company that we indirectly acquired several years ago to facilitate our expansion into China. BabyCare's business model has been developed specifically for China in light of its direct selling laws and regulations there. BabyCare has been granted licenses from the Chinese government to conduct direct selling in four provinces in China and will be required to obtain licenses from municipalities and provinces in China where it does not hold a license.

231.    In addition, the 2015 10-K stated, in relevant part, that "BabyCare's business model has been designed specifically for China based on a number of factors, including: (i) BabyCare's communications with the Chinese government, (ii) BabyCare's interpretation of the direct selling regulations, as well as their understanding of how the government interprets and enforces the regulations, and (iii) BabyCare's understanding of how other multinational direct selling companies operate in China."

232.    The 2015 10-K also stated, in relevant part, "[f]urther, we require our partners, subcontractors, agents and others who work for us or on our behalf to comply with the FCPA and other anti-bribery laws. Although we have policies and procedures designed to ensure that we, our employees, our agents and others who work with us in foreign countries comply with the FCPA …."

233.    Finally, the 2015 10-K stated, in relevant part:

Historically, our growth in this region was led by Hong Kong and the Philippines. Since our acquisition of BabyCare, however, our strategy in Asia Pacific has been centered on generating growth in China. Consequently, our growth in Asia Pacific over the last few years has been led by China, and our results in Hong Kong have declined.

234.    The statements referenced in ¶¶ 226-233 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the conduct described in (ii) included, but was not limited to, the Company's improper shift of revenue from Hong Kong to mainland China, which accounted for the drop-off in Hong Kong sales; (iv) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (v) these practices constituted violations of the FCPA; (vi) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct, were unlikely to be sustainable, and could not fairly be characterized as "organic"; (viii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

235.    On May 3, 2016, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended April 2, 2016 (the "Q1 2016 8-K").  For the quarter, USANA announced net income of $22.3 million, or $0.89 per diluted share, on revenue of $240.45 million, compared to net income of $19.68 million, or $0.75 per diluted share, on revenue of $219.38 million for the same period in the prior year.

236.    In the Q1 2016 8-K, USANA stated, in part:

**Regional Results**

Net sales in the Asia Pacific region increased by 13.2% to $176.4 million, despite a negative $10.3 million impact from a stronger U.S. dollar. Within Asia Pacific, net sales:

- Increased by 15.5% in Greater China (20.8% on a constant currency basis);

- Increased by 14.4% in the North Asia region (23.2% on a constant currency basis); and

- Increased by 7.8% in the Southeast Asia Pacific region (16.9% on a constant currency basis).

Sales growth in Greater China was driven by 23.6% Associate growth in Mainland China, while sales growth in North Asia resulted from 30.0% Associate growth in South Korea. Sales growth in Southeast Asia Pacific was due to strong Associate growth in several markets in the region. Indonesia also provided a solid contribution of new Associates to the region for its first full quarter of operations. The total number of active Associates in the Asia Pacific region increased by 20.0% year-over-year and 3.8% sequentially.

237.    The statements referenced in ¶¶ 235-236 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the

foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

238.   On May 4, 2016, the Company held its Fiscal Q1 2016 Earnings Conference Call (the "Q1 2016 Earnings Call").

239.   During the Q1 2016 Earnings Call, Defendant Wentz had the following exchange with Ramey:

> **<Q - Timothy S. Ramey>**: Okay. And obviously, everybody is watching China, and China performed very well. Can you talk about what's driving that, is it the number of products that are authorized in China, is it more geographic reach, is it – presumably there's some lever that is – you're pulling that continues to give you a great performance there?

> **<A - David A. Wentz>**: China just continues to grow organically. As we mentioned, we're not putting fuel in the fire, we're not doing a lot of promotions and contests and other incentives right now just due to the transition to the new manufacturing facility and wanting to maintain good customer service. We're also working really hard to buildup our management team. We've grown from a $15 million to a $370 million company over there extremely fast and trying to put the infrastructure and people in place to manage this new size business.

> So, we want to make sure that we're able to continue great customer service, great product supply, not any back orders or creating things that would get in the way of our distributors when we do start to run again. ***So, we're just watching it grow organically, adding more families, adding thousands of new families in China every week. And it's just a very organic growth with no push or influence from us***, which is very nice to see that – that's a baseline type growth not –once we get the manufacturing and infrastructure and management team developed more this year, where we can hopefully then turn up the volume a little bit there and get it going a little faster knowing that we can sustain that growth.

> (Emphasis added).

240.   On the same call, Defendant Wentz and Camma had the following exchange:

> **<Q - Frank Camma>**: Okay. That's good. [ph] I mean, important to know (19:21). So, the Chinese economy obviously not really having any slowdown on your company. So, I was wondering what – Dave, what's the biggest thing that kind of keeps you up on that business since it is obviously your biggest market?

**<A - David A. Wentz>**: With China, I'm more optimistic and excited than ever. We've brought in a new president for the future who was – came into operations as a VP and it was so fantastic, we promoted him to president, well, at the beginning of April. And we are just – the communication, the understanding of the business, the understanding of its individual, of the industry has us very excited. And he's assembling a big – a professional team that can handle a business of this size. And we're excited about the people that he's bringing in. We're excited about his relationship with the field, his understanding of the business, plus operations, and that's why we brought him. He's got a full understanding of the business. And we are getting more and more excited about what we'll be able to accomplish as we transition more from the old culture to our culture over there. And we expect to see great things.

China always worries us because it's unknown. But it's now known to us more than ever before, and we have a better understanding of what challenges and where to work and feel more confident now with the understanding. And we're talking more to other players in our industry and comparing notes and understanding where we stand and feel better I think than we ever have in the last six years about China, ***and knowing how to manage it and how to work within that culture and that system***. So, I'm extremely excited. [ph] Sid (21:16) is going to do a fantastic job for us. And I have a lot less concerns about China than I did, say, a year ago.

(Emphasis added).

241.   The statements referenced in ¶¶ 238-240 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China, demonstrating an outright inability "to work within that system"; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice

regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct, were unlikely to be sustainable, and could not fairly be characterized as "organic"; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

242.    On May 11, 2016, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended April 2, 2016 (the "Q1 2016 10-Q").

243.    The Q1 2016 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

244.    The statements referenced in ¶¶ 242-243 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying

with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

245.    On May 12, 2016, USANA announced that the Company had received MOFCOM approval for direct selling activities in the provinces of Liaoning, Shandong, Shanxi, Sichuan, and Guangdong, as well as the municipalities of Dalian, Qingdao, and Shenzhen.   In a press release, Defendant Wentz stated: "We are pleased to have received these additional licenses in China, where we continue to expand the reach of our world-class products. . . . *We remain committed to working with the Chinese government as we continue growing our business in this promising market*."

(Emphasis added).

246.    The statements referenced in ¶ 245 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China, and, as such, was not "working with the Chinese government"; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets;

(iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

247.    On July 26, 2016, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended July 2, 2016 (the "Q2 2016 8-K").  For the quarter, USANA announced net income of $25.76 million, or $1.04 per diluted share, on revenue of $258.51 million, compared to net income of $25.42 million, or $0.96 per diluted share, on revenue of $233.24 million for the same period in the prior year.

248.    In the Q2 2016 8-K, USANA stated, in part:

**Regional Results**
Net sales in the Asia Pacific region increased 15.1% to $194.2 million, despite a negative $9.5 million impact from a stronger U.S. dollar. Within Asia Pacific, net sales:

- Increased by 17.4% in Greater China (23.3% on a constant currency basis);

- Increased by 11.1% in the Southeast Asia Pacific region (16.2% on a constant currency basis); and

- Increased by 8.8% in the North Asia region (13.7% on a constant currency basis).

249.    The statements referenced in ¶¶ 247-248 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

250.    On July 27, 2016, the Company held its Fiscal Q2 2016 Earnings Conference Call (the "Q2 2016 Earnings Call").

251.    During the Q2 2016 Earnings Call, Defendant Wentz stated "[t]hat … we are pleased with the sales and customer growth that China continues to generate and believe that China will drive our growth during the second half of the year."

252.    The statements referenced in ¶¶ 250-251 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:

(i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

253.   On August 9, 2016, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended July 2, 2016 (the "Q2 2016 10-Q").

254.   The Q2 2016 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

255.   The statements referenced in ¶¶ 253-254 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:

(i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (vii) the foregoing conduct, when it became known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (viii) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

256.    On October 25, 2016, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended October 1, 2016 (the "Q3 2016 8-K").  For the quarter, USANA announced net income of $30.1 million, or $1.20 per diluted share, on revenue of $254.22 million, compared to net income of $25.61 million, or $0.96 per diluted share, on revenue of $233.29 million for the same period in the prior year.

257.    In the Q3 2016 8-K, USANA stated, in part:

"While USANA posted another quarter of solid growth and achievements, our topline results in the Greater China region came in below our expectations and impacted our overall results," said Dave Wentz, USANA's Co-CEO. "Our top priorities for 2016 continue to be completing the transition to our state-of-the-art production facility in Beijing and enhancing our information technology infrastructure around the world. These improvements are essential to allow USANA to continue providing the highest level of customer service and to provide the foundation for future growth. Our focus on these objectives, however,

has taken precedence over short-term initiatives to drive sales growth around the world in 2016 and also affected our momentum in China during the quarter. I am pleased to report, however, that during the quarter we received all of the necessary permits to begin production in our new China facility and we now anticipate that the facility will be fully operational by the end of the year. With this facility coming online, ***we are making preparations to begin offering growth initiatives in China in early 2017***, but continue to believe that we will be in a better position to fully drive growth in China and our other markets when the improvements to our IT infrastructure are complete."

. . .

**Regional Results**

Net sales in the Asia Pacific region increased 13.2% to $190.4 million year-over-year, despite a negative $4.5 million impact from a stronger U.S. dollar. Within Asia Pacific, net sales increased by 10.8% in Greater China and 16.2% in constant currency. Net sales growth in Greater China resulted from a 22.2% increase in the number of active Associates in mainland China.

(Emphasis added).

258.   The statements referenced in ¶¶ 256-257 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) a nation-wide investigation in China into illegal multi-level marketing practices by BabyCare and/or USANA had kicked off in October 2016; (vii) as

such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became fully known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

259.    On October 26, 2016, the Company held its Fiscal Q3 2016 Earnings Conference Call (the "Q3 2016 Earnings Call").

260.    During the Q3 2016 Earnings Call, Defendant Wentz stated that:

> Our team determined at the outset of 2016 that it was not in the best interest of the company or its customers for the company to run significant growth initiatives, while focusing on the strategic objectives. Doing so, could have produced a host of issues for the company, including product backorders and customer service challenges in China and other market. So we have not offered any significant growth incentives in China or our other markets during 2016. ***And the growth we have achieved has been entirely organic from continued momentum within the sales force.***

(Emphasis added).

261.    Defendant Wentz further claimed that "I am confident in the strength of our underlying business in China and our other markets and believe that the strategy we are executing will better position USANA for long term growth."

262.    The statements referenced in ¶¶ 259-261 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company and/or its BabyCare subsidiary engaged in illegal multi-level marketing practices in China; (ii) the Company failed to keep records that accurately and fairly reflected the Company's transactions and dispositions of assets; (iii) the Company failed to devise and

maintain a system of internal accounting controls sufficient to ensure management's control, authority, and responsibility over the firm's assets; (iv) these practices constituted violations of the FCPA; (v) BabyCare already received at least one official warning of its failure in complying with direct sales practice regulations; (vi) a nation-wide investigation in China into illegal multi-level marketing practices by BabyCare and/or USANA had kicked off in October 2016; (vii) as such, the Company's China revenues were in part the product of and enhanced by unlawful conduct and unlikely to be sustainable; (viii) the foregoing conduct, when it became fully known, was likely to subject the Company to significant regulatory scrutiny, as well as civil and/or criminal penalties; and (ix) as a result of the foregoing, USANA's public statements were materially false and misleading at all relevant times.

263.     On November 9, 2016, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q3 2016 8-K and reporting in full the Company's financial and operating results for the quarter ended October 1, 2016 (the "Q3 2016 10-Q").

264.     The Q3 2016 10-Q contained signed statements pursuant to SOX by Wentz and Jones, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

**The Truth Emerges**

265.     On January 11, 2017, Gull Global Ltd. (wholly indirectly owned and controlled by Myron Wentz), sold 20,000 shares of USANA stock at approximately $61 per share.

266.     On February 7, 2017, post-market, USANA issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and

operating results for the quarter and year ended December 31, 2016 (the "2016 8-K").   In the

2016 8-K, USANA stated, in relevant part:

**Internal Investigation of China Operations**

The Company is voluntarily conducting an internal investigation of its China operations, BabyCare Ltd. The investigation focuses on compliance with the Foreign Corrupt Practices Act ("FCPA") and certain conduct and policies at BabyCare, including BabyCare's expense reimbursement policies. The Audit Committee of the Board of Directors has assumed direct responsibility for reviewing these matters and has hired experienced counsel to conduct the investigation. While the Company does not believe that the subject amounts are quantitatively material or will materially affect its financial statements, it cannot currently predict the outcome of the investigation on its business, results of operations or financial condition. The Company has voluntarily contacted the Securities and Exchange Commission and the United States Department of Justice to advise both agencies that an internal investigation is underway and intends to provide additional information to both agencies as the investigation progresses. Because the internal investigation is in its early stage, the Company cannot predict the duration, scope, or result of the investigation.

267.    On this news, USANA's share price fell $7.25, or 11.57%, to close at $55.40 on

February 8, 2017.

268.    On February 8, 2017, an analyst report by Pivotal Research Group was cautiously

optimistic: "[t]he major risk to USANA is regulatory – both U.S. and Chinese. The FCPA

internal investigation is likely not a big problem but it is a problem."

269.    On March 4, 2017, Chinese media reported that Hengyang County Public

Security Bureau ("PSB" or "Hengyang PSB") and Hengyang County Administration of Industry

and Commerce ("Hengyang AIC") conducted joint enforcement actions against BabyCare's

branch companies in Guangzhou City, Guangdong Province and Changsha City, Hunan Province

simultaneously on March 3, 2017, and arrested a total of thirteen individuals who were suspected

of being engaged in "pyramid sales activities", including a senior manager of BabyCare and a

dozen of "senior level distributors."

270.    On March 10, 2017, a corroborating news article was published on the website of Direct Sales Opinions (直销评论网) (DSO), and added that over 10 BabyCare people were listed online by the police as wanted persons, and that, in addition to the above-described arrests, authorities froze a total of RMB 360 million in BabyCare's "company account."

271.    On April 27, 2017, allegations of an investigation in China were made by a contributor to the finance blog *Seeking Alpha*, who wrote a report that not only alleged that arrests and frozen bank accounts happened, but who also questioned whether or not the head of BabyCare had lost his job.[10]

272.    The report also documented the Company's dramatic, near-total shift to the China market in mid-2013, the risks of which were heightened by its FCPA violations and subsequent arrests and asset seizures:



---

273.   The report revealed that since the day of the arrests in China, Myron Wentz-controlled Gull Global Ltd. had sold 60,000 shares of USANA and filed a Form 144 to sell 120,000 more, even though the arrests had never been disclosed to the investing public by USANA.

274.   Shortly thereafter, hedge fund manager John Fichthorn of Dialectic Capital made an appearance on CNBC and talked about several companies he was betting against.  USANA made the list, and Mr. Fichthorn cited the very same allegedly arrests and regulatory intervention that were alleged in the *Seeking Alpha* report.

275.   On April 28, 2017, the Company issued a minimalist response on a Form 8-K filed with the SEC, stating only that:

> The Seeking Alpha web blog from yesterday was posted anonymously by a purported short seller based on the author's opinion. The web blog contains multiple distortions of facts and misleading conclusions. USANA takes its global regulatory obligations seriously.

276.   Notably, however, the Company did not directly deny any of the report's contentions.

277.   On May 3, 2017, the Company included the following statement in an exhibit to a filed Form 8-K, but did not include it in their press release:

> No employees or Associates of BabyCare are under arrest by the Chinese government and no BabyCare bank accounts are frozen by the Chinese government. **During the first quarter of 2017, however, an inquiry from a provincial-level regulator was received and promptly resolved by BabyCare. Certain individuals at BabyCare were initially detained for questioning and one of BabyCare's bank accounts was preliminarily attached by the regulator.** Communications with the regulator were initiated by BabyCare and the bank account hold was promptly relinquished and such individuals were also released from inquiry. **A fine was issued in a BabyCare Associate's name and paid by BabyCare in connection with resolving this matter. This matter was closed during the quarter and the Company does not view it as quantitatively material to the quarter nor BabyCare's ongoing operations in China**. As disclosed in risk factors in the Company's periodic reports filed with the Securities and Exchange Commission: Chinese regulators regularly monitor and

make inquiries about the business activities of direct sellers in China and have done so with BabyCare. These inquiries or complaints may result in the Chinese government investigating the particular complaint or BabyCare's business in general. There have been instances where inquiries or complaints about BabyCare's business have resulted in warnings from the Chinese government and/or the payment of fines by BabyCare.

In connection with the Company's remediation efforts under the internal investigation, BayCare's President, Mr. Liu, and others, have essentially been placed on leave. The Company's remediation efforts in this regard include a review of several BabyCare positions and employees.

(Bold added).

278.    The Company's response confirmed that (1) a provincial investigation had taken place; (2) that bank accounts were frozen; and (3) that the head of BabyCare operations has "essentially been placed on leave" but sidestepped the issue of whethers any BabyCare *had been* arrested and whether assets *had been* frozen: the response only denied that these things were not occurring at present.  More importantly, the Company failed to explain why this information had not previously been released to the market.

279.    The Company did not disclose further information about the matter in the Form 8-K, including the reason(s) for the detention, records seizure, and fine, and the Company's internal investigation into its FCPA violations continues into its fifth consecutive month.

280.    Also on May 3, 2017, the Company held its Fiscal Q1 2017 Earnings Conference Call (the "Q1 2017 Earnings Call").   On the Q1 2017 Earnings Call, Defendant Guest continued the Company's pattern of providing evasive and non-responsive explanations with respect to the *Seeking Alpha* article:

Now, before opening the call for questions, I'd like to comment on the anonymous short seller blog-post made last week. Typically, we don't respond to short seller reports, particularly anonymous ones. We felt however, in this case, it was prudent to provide clarification. The blog-post contains distortions of fact which lead to misleading conclusions.

While we have no intention of responding to each of the various claims contained in the blog, we cite several examples of distortion in our management commentary, results and outlook document, which we posted on our website after market close yesterday and subsequently filed with the SEC.

The most important clarification is that our China business continues to operate as it has historically and in the ordinary course of business. BabyCare's Associates are buying and selling products as well as enrolling new customers. As we reported yesterday, BabyCare generated 21% constant currency sales growth and 80% total active customer growth year-over-year for the first quarter.

Additionally, BabyCare is not subject to any new regulatory mandates or decrees from the Chinese government and the Chinese government has not imposed any new restrictions on BabyCare's cash and liquidity or its ability to repatriate cash to the U.S.

With that, I'll finish by telling you that I'm confident in the strength of our business in China and all around the world. We are pleased with the continued advancement of our technology and science, which is helping us to further personalize our products as well as the overall experience of our customers that that they have with USANA.

281.    On the same call, Josh Foukas ("Foukas"), USANA's Executive Vice President of

Legal, had the following exchange with Ramey:

**Timothy Ramey**

I wonder if you can give us any update on the status of the internal investigation, any timeline including that. And I know you self-reported to the SEC and I believe with the DOJ as well. Has there been an active SEC investigation launched into the activities in China?

**Josh Foukas**

Good morning, Tim. This is Josh. So with respect to the internal investigation, we can't provide further comment at this point, especially substantive comments. The investigation is proceeding according to our schedule. And we will have a disclosure that appears in the 10-Q that we'll file shortly after this call, particularly on the internal controls and what we're doing there. But aside from that, we can't comment further right now on that.

282.    Another *Seeking Alpha* article published on May 3, 2017 stated that "the real story

with USNA over the last couple of days has been allegations made [ ] citing Chinese media, that

the company is under investigation in China, which is responsible for more than 20% of the

company's total revenue."[11]

283.   The May 3 article went on to state that –

With regulatory questions like these up in the air and something not sitting right about the way the company has disclosed them, we feel like investors in US and a could do better and find different places to allocate their capital. We certainly don't think that the business model is investable for the long term and we would not want to risk it on potential future regulatory issues on a company that quite frankly hasn't met the standards we look for in terms of disclosure.

284.   On May 10, 2017, USANA filed a Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2017 8-K and reporting in full the Company's financial and operating results for the quarter ended April 1, 2016 (the "Q1 2017 10-Q").

285.   The Q1 2017 10-Q contained the disclosure referenced by Foukas on the Q1 2017 Earnings Call:

On February 7, 2017, the Company disclosed on Form 8-K that it is conducting a voluntary internal investigation regarding its BabyCare operations in China. ***In connection with this investigation, the Company expects to continue to incur costs in conducting the on-going review and investigation, in responding to requests for information in connection with any government investigations and in defending any potential civil or governmental proceedings that are instituted against it or any of its current or former officers or directors.*** The Company has voluntarily contacted the Securities and Exchange Commission and the United States Department of Justice to advise both agencies that an internal investigation is underway and intends to provide additional information to both agencies as the investigation progresses. Because the internal investigation is in its early stage, the Company cannot predict the duration, scope, or result of the investigation. One or more governmental actions could be instituted in respect of the matters that are the subject of the internal investigation, and such actions, if brought, may result in judgments, settlements, fines, penalties, injunctions, cease and desist orders, criminal penalties, or other relief.

(Emphasis added).

286.   USANA, in the Q1 2017 10-Q, also repeated the May 3 disclosure that –

---

[11] Parke Shall, "Usana: China Uncertainty Means It Should Be Avoided" *Seeking Alpha* (May 3, 2017), https://seekingalpha.com/article/4068386-usana-china-uncertainty-means-avoided.

There have been instances where inquiries or complaints about BabyCare's business have resulted in the payment of fines by BabyCare.  For instance, during the first quarter of 2017, an inquiry from a provincial-level regulator was received and promptly resolved by BabyCare.  A fine was issued in a BabyCare Associate's name and paid by BabyCare in connection with resolving this matter. The fine was not quantitatively material.

287.    The statement in ¶ 285 above, however, did not specify, *inter alia*, (i) the number of inquiries; (ii) the nature of the inquiries; (iii) the amount paid in fines; (iv) the identity of the "provincial-level regulator"); (v) the reason(s) why BabyCare paid fines in Associates' names; (vi) the meaning of the phrase "quantitatively material"; and (vi) why this information had not previously been disclosed to investors.

288.    In the Q1 2017 10-Q, the Company *did* provide a hint as to the materiality of the situation when it revealed "that Net earnings for the first quarter of 2017 decreased 4.2% to $21.4 million, a decrease of $0.9 million, compared with the first quarter of 2016 …. driven in part by higher incremental expense related to China, ***the Company's internal investigation in China***, higher Associate incentives and a higher effective tax rate."

289.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

290.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired USANA securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

291.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, USANA securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by USANA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

292.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

293.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

294.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of USANA;

- whether the Individual Defendants caused USANA to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of USANA securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

295.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

296.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- USANA securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold USANA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

297.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

298.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

299.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

300.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

301.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of USANA securities; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire USANA securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

302.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for USANA securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about USANA's finances and business prospects.

303.    By virtue of their positions at USANA, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

304.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of USANA, the Individual Defendants had knowledge of the details of USANA's internal affairs.

305.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of USANA.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to USANA's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of USANA securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning USANA's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired USANA securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

306.    During the Class Period, USANA securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of USANA securities at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of USANA securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of USANA securities declined

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

307.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

308.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

309.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

310.    During the Class Period, the Individual Defendants participated in the operation and management of USANA, and conducted and participated, directly and indirectly, in the conduct of USANA's business affairs.  Because of their senior positions, they knew the adverse non-public information about USANA's misstatement of income and expenses and false financial statements.

311.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to USANA's financial condition and results of operations, and to correct promptly any public statements issued by USANA which had become materially false or misleading.

312.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which USANA disseminated in the marketplace during the Class Period concerning USANA's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause USANA to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of USANA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of USANA securities.

313.    Each of the Individual Defendants, therefore, acted as a controlling person of USANA.  By reason of their senior management positions and/or being directors of USANA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, USANA to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of USANA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

314.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by USANA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 4, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Louis C. Ludwig*
Patrick V. Dahlstrom
Louis C. Ludwig
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Email:  pdahlstrom@pomlaw.com
            lcludwig@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com
            hchang@pomlaw.com

**CHRISTENSEN YOUNG
& ASSOCIATES**
Zane L. Christensen
Steven A. Christensen
9980 South 300 West, Suite 200

Sandy, Utah 84070
Telephone: (801) 285-7491
Facsimile: (888) 569-2786
Email: zane@christensenyounglaw.com
        steven@christensenyounglaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Los Angeles, California 90067
Suite 1100
Telephone: 1-800-977-7401
Facsimile: 1-800-536-0065
Email:  michael@goldberglawpc.com
       brian@goldberglawpc.com

*Attorneys for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this 4th day of August 2017, I electronically filed Plaintiff's Consolidated Amended Class Action Complaint using the Court's CM/ECF system, which will be sent electronically to all counsel of record.

<div align="right">

*s/ Louis C. Ludwig*
Louis C. Ludwig

</div>